Thomas Dale Ferguson petitioned for a writ of certiorari to review the Court of Criminal Appeals' judgment affirming his convictions of four counts of capital murder and his sentence of death. We granted Ferguson's petition to review the alleged errors Ferguson claims were made by the trial court and the Court of Criminal Appeals. After thoroughly reviewing the record for error and after fully considering all of his arguments, we affirm the judgment of the Court of Criminal Appeals.
The Court of Criminal Appeals succinctly set out the pertinent facts of this case, as follows:
 "The appellant, Thomas Dale Ferguson, was indicted for four counts of capital murder in connection with the shooting deaths of Harold Pugh and his 11-year-old son Joey Pugh. The jury found Ferguson guilty of all counts charged in the indictment: two counts of murder made capital because the killings were committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975; one count of murder made capital because it involved the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975; and one count of murder made capital because the victim was less than 14 years old, see § 13A-5-40(a)(15), Ala. Code 1975. The jury recommended, by a vote of 11-1, that Ferguson be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced Ferguson to death by electrocution.
". . . .
 "The State's evidence tended to show the following. On July 21, 1997, Harold Pugh and his 11-year old son Joey Pugh were reported missing to the Colbert County Sheriff's Department. Mike Sennett, a friend of the Pughs, testified that in the early evening hours of July 21, after hearing that the Pughs were missing, he and several friends went *Page 972 
 looking for the Pughs at Cane Creek in Colbert County. The local authorities and a rescue squad were also searching for the Pughs in this same area. Sennett testified that Harold and his son were avid fishermen. Making one more pass up Cane Creek in his boat before going home, Sennett found the bodies of Harold and Joey Pugh floating in the creek. Autopsies conducted the following day revealed that each victim had been shot twice in the head.
 "Several days later, on July 26, 1997, a boat was found in a clearing in a remote wooded area in neighboring Franklin County. In the boat were rods and reels, a tacklebox, life jackets, a baseball-style cap with a wristwatch inside it (on the boat's [front seat]), and another baseball-style cap on the backseat. At Ferguson's trial, the individual who found the boat testified that because he had heard television and radio reports that the sheriff's department was looking for a boat, a description of which matched that of the boat he found in the wooded area, he telephoned the sheriff's department.
 "Oscar Hood of the Colbert County Sheriff's Department testified that he received the call concerning the boat and that when he arrived at the location, the boat appeared to be the boat that the authorities were looking for in connection with the Pughs' murders. Hood ran a registration check on the boat and determined that it was in fact Harold Pugh's boat. Other testimony at trial showed that a pedestal-type seat had been removed from the boat and that two spent 9mm shell casings were found inside the boat.
 "Further testimony revealed that on the day the victims' bodies were found, two armed men wearing dark-colored army fatigues, hooded shirts, sunglasses, and gloves had robbed the Deposit Guaranty National Bank in Belmont, Mississippi. An employee at the bank testified that she could not identify the men, but that she could identify the truck the men had fled in after the robbery. She described the truck as a black Chevrolet Z-71 pickup truck with a chrome toolbox in the rear bed. Shortly after the robbery, a truck matching that description was found by an officer of the Belmont Police Department five miles from the bank, in a heavily wooded area. The truck, which had been set on fire, was discovered after the police saw the smoke from the fire. On the front passenger-side floorboard of the truck, the police found a pedestal-type seat, which, according to testimony, was typical of the seats found in the front of bass-fishing boats.
 "Following his arrest, Ferguson gave police a statement concerning his involvement in the robbery and murders of Harold and Joey Pugh and in the robbery of the bank in Mississippi. Ferguson told police that he and his four codefendants — Mark Moore, Michael Craig Maxwell, Donald Risley, and Kino Graham — had conspired to rob banks to get money. According to Ferguson, they bought clothing matching that described by the employee of the bank robbed in Belmont, Mississippi, to wear during the robberies, and Moore also bought guns, handheld radios, and other items to use in the robberies. Ferguson told police that Moore was the `leader' of the group.
 "In addition, Ferguson told police that on the day of the murders, he and the others were looking for two cars to steal to use in the Belmont bank robbery. According to Ferguson, while he, Moore, Maxwell, Graham, and Risley were looking for a car to steal, they saw the Pughs' truck parked near the boat landing *Page 973 
 at Cane Creek. When the Pughs arrived at the landing in their boat, Ferguson said, Harold Pugh got out of the boat and into his truck. According to Ferguson, before he knew it, Maxwell was holding a gun to the Pughs and was ordering the Pughs to get back into the boat. Ferguson said that Maxwell jumped into the boat, along with Moore, and that Moore then ordered Ferguson to get into the boat. According to Ferguson, Maxwell was armed with a 9mm pistol and Moore was armed with a .357 pistol. Ferguson maintained that he did not have a weapon. Ferguson stated that they then left in the boat with the victims, heading downstream, while Risley and Graham waited with the truck. According to Ferguson, he heard a shot and saw that Maxwell had shot Harold Pugh. Ferguson claimed that he did not know who shot Joey Pugh, but he did say that Maxwell and Moore threw the victims' bodies into the creek.
 "Ferguson stated that after the shooting he became physically ill and that he was throwing up and very upset. Ferguson further stated that after the murders, Moore threatened him, telling Ferguson that if he told anyone about what had happened, he would kill Ferguson and Ferguson's family.
 "Ferguson stated that after returning the boat to the landing where Graham and Risley were waiting, he and the others then loaded the boat onto the trailer and drove the Pughs' truck and the boat to a clearing in the woods in Franklin County. Ferguson said that he removed a pedestal-type seat from the boat and threw it inside the victims' truck.
 "The following morning, according to Ferguson, Moore came to his house and the two left together to pick up Risley. Then, Ferguson said, they went to Maxwell's apartment where everyone, except Graham, who did not come to Maxwell's apartment, discussed plans to rob the bank in Belmont, Mississippi. Ferguson stated that Maxwell and Risley, who, according to Ferguson, were going to be the ones to go inside the bank, left Maxwell's apartment in Maxwell's car, followed by him and Moore in Moore's truck, and drove to where they had left the victims' truck and boat. From that location, Ferguson said, Risley drove the victims' truck to Belmont, and Maxwell drove his own car, while he and Moore followed in Moore's truck. Maxwell stated that he and the other men then drove to a location in Belmont, near the bank, where they left Maxwell's car. From there, Ferguson said, Maxwell and Risley drove the victims' truck to the bank as he and Moore, who were to act as `covers' while the bank was being robbed, followed in Moore's truck. Ferguson stated that after Maxwell and Risley had committed the robbery, Maxwell drove the victims' truck back to the location where they left Maxwell's car, and he and Moore met them at that location. Ferguson said that they put their guns in Moore's truck, and put the clothes they had worn in the robbery in the victims' truck. According to Ferguson, Risley then poured gasoline on the victims' truck and set it on fire. Ferguson stated that he and the others then returned to Maxwell's apartment, where they divided the proceeds of the bank robbery — approximately $40,000.
 "Shortly after the questioning ended and Ferguson had completed his statement, Ferguson told Investigator Frank Brians that he had something else he wanted to say. Ferguson then stated that he had lied in his earlier statement when he said that Moore was at Cane Creek and on the boat when the Pughs were murdered. Ferguson now said *Page 974 
 that Moore was not at Cane Creek and that Moore was not on the boat when the victims were shot, but that only Ferguson and Maxwell were on the boat with the victims. Ferguson, who still maintained that he was not armed while on the boat, now claimed that Maxwell shot both victims.
 "Donald Risley, one of Ferguson's codefendants, testified at Ferguson's trial and corroborated most of Ferguson's statement to police. Risley's wife and Ferguson's wife were first cousins, and Risley had been friends with Ferguson for approximately eight years. Risley testified that Ferguson had approached him and asked him if he wanted to get involved in the plan to rob banks to get some `easy money.' (R. 510.) Risley stated that Moore and Maxwell were the `leaders of the group.' (R. 514.) Risley, like Ferguson, testified concerning the circumstances surrounding the murders at Cane Creek and the bank robbery in Belmont. Risley testified that on the afternoon of the murders, Ferguson picked him up at a friend's, Daryl May's, house and that he and Ferguson then went to Maxwell's apartment. From there, Risley said, they went to Cane Creek where they saw the victims' truck parked at the boat landing. Risley stated that he was armed with a .357 pistol, that Maxwell had a 9mm pistol, that Graham had a Colt .45 pistol, and that Ferguson was carrying a .357 pistol. Testifying to essentially the same facts as Ferguson did concerning how they approached the Pughs and ordered them into the boat, Risley further testified that Maxwell and Ferguson got into the boat with the victims and Maxwell drove the boat downstream. Risley said that the victims were sitting in the back of the boat, while Ferguson was standing near the front and was pointing a gun at the Pughs. Risley testified that neither he nor Ferguson [was] threatened into robbing the Pughs and that no one threatened Ferguson to get him to get into the boat. According to Risley, when Ferguson and Maxwell returned in the boat, approximately 10 minutes after they had left, neither victim was in the boat and Ferguson was sitting on a pedestal-type seat in the front of the boat.
 "Risley continued to testify to the events that occurred after the murders up until the time of the robbery of the bank in Mississippi. Risley testified to essentially the same facts as did Ferguson in his statement to police. Risley stated that Ferguson took the pedestal-type seat out of the boat and put it in the truck because, Risley said, Ferguson was afraid that he might have touched it and left his fingerprints on it. Risley also stated that while he was at Cane Creek, Ferguson never appeared to be sick or upset, and he never saw Ferguson throw up. Risley further told police that several days after the murders, Ferguson, in response to Risley's question whether he had shot the Pughs, said that he had and further told Risley that he and Maxwell had shot them because they did not want any witnesses. Ferguson also told Risley that he shot Harold Pugh and that Maxwell shot Joey Pugh. Maxwell, who was also present during Risley's and Ferguson's conversation about the shooting, told Risley that Harold was not dead after the first shot, so he shot him again and he made Ferguson shoot Joey again.
 "Other evidence at trial showed that the 9mm pistol police took from Moore's house was the weapon that fired at least one of the bullets recovered from Harold Pugh's body. The two spent shell casings found in the boat were also fired by the 9mm pistol recovered from Moore's house. The evidence further showed *Page 975 
 that one of the bullets recovered from Harold's body and one of the bullets recovered from Joey's body were lead semi-wad cutter bullets that could be loaded in either a .38 or .357 pistol. Although the State's firearms expert could not conclusively state that a .357 pistol taken from Moore's house was the weapon that fired two of the bullets recovered from the victims' bodies, he was able to say that the pistol was the type of pistol that could fire that particular type of bullet. The State's firearms expert also testified that a bag of ammunition, which had been taken from Ferguson's house and submitted to him for evaluation, contained ammunition that was capable of being fired through the .357 pistol recovered from Moore's house.
 "There was also testimony that Ferguson, Maxwell, Graham, and Moore had all worked together at a furniture distribution center in Russellville, in Franklin County, Alabama. All of the men, except Graham, quit their jobs, or failed to return to work, in the early to middle part of July 1997, just several weeks before the Pughs' murders and the bank robbery in Belmont. Graham last reported to work on August 20, 1997. Also, Daryl May, a friend and coworker of Ferguson's, testified that on the afternoon of the murders, Maxwell came to his house to pick up Ferguson, who was watching television there. May also testified that because Risley did not have a car, he drove him to work every morning, except the morning of July 21, the day after the murders. May said that Risley did not show up for work that morning. Testimony also showed that in late July 1997, shortly after the bank robbery in Belmont, Ferguson paid $1,750 in cash for a used car, using `new' $20 bills."
Ferguson v. State, [Ms. CR-97-2524, June 30, 2000] 814 So.2d 925,937 (Ala.Crim.App. 2000) (footnotes omitted).
Ferguson presented 23 issues in his certiorari petition. All of these issues were addressed in the Court of Criminal Appeals' opinion. The Court of Criminal Appeals reviewed many of Ferguson's claims under the plain-error standard because Ferguson had failed to object to the alleged errors at trial. This Court has reviewed all of the those issues presented in the Court of Criminal Appeals' opinion, and we have found no error, plain or otherwise. We address four of Ferguson's arguments with more particularity below.
 I. Mental Health as a Mitigating Circumstance
Ferguson argues that the trial court erroneously required him to prove that he was legally insane rather than properly considering his mental health as both a statutory and a nonstatutory mitigating circumstance during his sentencing hearing. He alleges that the Court of Criminal Appeals affirmed as to this issue, in violation of Eddings v. Oklahoma,455 U.S. 104 (1982), and Whisenhant v. State, 370 So.2d 1080, 1095-96
(Ala.Crim.App. 1979). The trial court, in considering Ferguson's mental health as a statutory mitigating circumstance, wrote:
 "2. The Capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance [§ 13A-5-51(2), Ala. Code 1975]. DOES NOT EXIST.
 "Although the clinical psychologist testified that the defendant had a low I.Q., may be mildly retarded, and may be handicapped mentally[,] [h]e also testified [that] he did not suffer from any delusions or was psychotic. He knew right from wrong and was not insane. He had the ability to make choices, had a good job, was married, had advanced *Page 976 
 in his job, and had opportunities. There was no evidence that the defendant suffered from any extreme mental or emotional disturbances."
C.R. at 137-38.
 A. Nonstatutory Mitigating Circumstance
The Court of Criminal Appeals affirmed the trial court's findings concerning Ferguson's mental health as a nonstatutory mitigating circumstance on the basis that the trial court had properly considered the mitigating evidence, but placed little weight upon it in light of the other testimony and evidence produced at trial. We conclude that the Court of Criminal Appeals correctly applied the settled law on this issue in finding that the trial court had in fact taken into account Ferguson's mental health as a possible nonstatutory mitigating circumstance. SeeLockett v. Ohio, 438 U.S. 586 (1978); Ex parte Hart, 612 So.2d 536, 542
(Ala. 1992) ("Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating."), cert. denied,508 U.S. 953 (1993); and Ex parte Slaton, 680 So.2d 909, 924 (Ala. 1996) ("`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'") (quotingBankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App. 1989)), cert.denied, 519 U.S. 1079 (1997)).
 B. Statutory Mitigating Circumstances
Ferguson also argues that the trial court refused to find that statutory mitigating circumstances existed because, he says it improperly invoked the requirements for proving legal insanity, i.e., that Ferguson could not appreciate the difference between right and wrong or otherwise conform his conduct to the requirements of the law. The trial court, in addition to considering Ferguson's mental health as a statutory mitigating circumstance, specifically found that the following statutory mitigating circumstance did not exist:
 "6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired [§ 13A-5-51(6), Ala. Code 1975]. DOES NOT EXIST.
 "The defendant's action[s] in or around the time of the killings indicate that he knew he was committing a criminal act, he tried to cover up his actions after the murders were committed."
C.R. at 139.
These findings by the trial court, as affirmed by the Court of Criminal Appeals, do not conflict with the United States Supreme Court's holding inEddings v. Oklahoma, as Ferguson argues. In Eddings, the Supreme Court applied the rule from Lockett v. Ohio, supra. It did not change the rule that a sentencer is to consider "the characteristics of the person who committed the crime." Eddings, 455 U.S. at 112 (quoting Gregg v.Georgia, 428 U.S. 153, 197 (1976)). This Court has also relied uponEddings for this rule. See Ex parte Borden, 769 So.2d 950, 958 (Ala. 2000) ("There is no requirement that a sentencing authority must find the evidence offered by the defendant as a mitigating factor; however, the sentencing authority may not be precluded from considering any mitigating factor." (Emphasis original.)); and Ex parte Cochran, 500 So.2d 1179,1186 (Ala. 1985) ("The language in Lockett and Eddings indicates that so long as the sentencer is not precluded from considering any mitigating factor, the requirements of the Constitution have been *Page 977 
satisfied."). We agree with the Court of Criminal Appeals that the trial court did in fact consider Ferguson's offer of the mitigating evidence of his mental health, but gave that evidence little weight when compared against the other evidence that it had before it. These findings are also consistent with Whisenhant v. State, 370 So.2d 1080, 1095 (Ala.Crim.App. 1979), because we agree with the Court of Criminal Appeals' holding that the trial court did not incorrectly apply the standard for legal insanity when it considered Ferguson's mental health as a mitigating circumstance.
 II. Nonstatutory Aggravating Circumstances
Ferguson argues that the trial court erred by using nonstatutory aggravating circumstances to override the jury's recommendation of life without parole. He alleges that the trial court did so based upon its findings that Ferguson had the "opportunity to reflect and withdraw from his actions," and by stating its opinion of "the nature of the crime and [Ferguson's] involvement in it." C.R. at 140. He argues that the Court of Criminal Appeals erred in affirming based upon its decision in Burgessv. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Crim.App. 1998), aff'd, Ex parte Burgess, [Ms. 1990803, August 25, 2000], ___ So.2d ___ (Ala. 2000). He argues that the Court of Criminal Appeals' reliance on its opinion in Burgess is in conflict with this Court's decision in Ex parte Stewart, 659 So.2d 122 (Ala. 1993). The Court of Criminal Appeals affirmed the ruling of the trial court on this issue and, in doing so, stated:
 "[W]e find Ferguson's interpretation of the trial court's sentencing order in this case to be `strained and unrealistic.' Burgess, supra. In the section of its sentencing order regarding aggravating circumstances, the trial court found the existence of only one — that the murders were committed during the course of a robbery. The court specifically noted that it `f[ound] no other aggravating circumstances to exist.' (C. 137.). . . .
 "In the final two paragraphs of the trial court's sentencing order, the trial court weighed the aggravating circumstance and the mitigating circumstances. It is in this portion of the sentencing order that the trial court refers to Ferguson's opportunity to `reflect and withdraw from his actions'; `the nature of the crime and the defendant's involvement in it'; and Ferguson's `capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.' After reviewing the trial court's sentencing order in its entirety, we conclude that the trial court's comments were merely that — editorial comments on the evidence presented during both the guilt phase and the sentencing phase of Ferguson's trial. The trial court's comments on the nature of the crime, Ferguson's involvement in it, and Ferguson's opportunity to withdraw from his actions were clearly `the trial court's basis for attributing a greater weight to the aggravating circumstance listed in § 13A-5-49(4) as compared to the mitigating circumstances.' Burgess, supra. In addition, the trial court's reference to Ferguson's ability to appreciate the criminality of his conduct or to conform his conduct to the law was merely an allusion to the fact that the trial court had found that this mitigating circumstance did not exist. As in Burgess, supra, `[i]t would take a strained interpretation of the trial court's weighing of the aggravating and mitigating circumstances to conclude that the court improperly considered any nonstatutory aggravating circumstances.' Accordingly, we find no error, plain or otherwise. as to this claim."
Ferguson, 814 So.2d at 959. Ex parte Stewart does not conflict with the Court of *Page 978 
Criminal Appeals' opinion, as Ferguson contends. Stewart addressed the issue whether a trial court had improperly instructed the jury that it could consider nonstatutory aggravating circumstances. That is not the issue presented here; we otherwise conclude that the trial court properly considered the available statutory aggravating circumstances contained in § 13A-5-49, Ala. Code 1975. The Court of Criminal Appeals did not err in affirming the ruling of the trial court as to this issue.
 III. Mitigating Effect of Mental Retardation
Ferguson argues that the trial court erred by not considering evidence that he was mentally retarded as a mitigating circumstance and that the Court of Criminal Appeals affirmed in violation of Penry v. Lynaugh,492 U.S. 302, 327-29 (1989), and Ex parte Henderson, 616 So.2d 348, 350
(Ala. 1992). In addressing this issue, the Court of Criminal Appeals stated:
 "Initially, we note that the trial court did refer to the evidence of Ferguson's low intelligence in several parts of its sentencing order — in its findings of fact from the sentencing phase of the trial, in reference to the statutory mitigating circumstances argued by Ferguson, and in reference to the nonstatutory mitigation offered by Ferguson. As stated above, although the trial court did not list this circumstance in its specific findings of nonstatutory mitigating circumstances, `the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating.' Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App. 1999), quoting Williams v. State, 710 So.2d 1276, 1347
(Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
 "Moreover, contrary to Ferguson's contention, we find no evidence in the record indicating that Ferguson was mentally retarded. In fact, both Ferguson's expert, Dr. Chudy, and the State's expert, Dr. Rosen, stated unequivocally that Ferguson was not mentally retarded. Although there was evidence that Ferguson had an IQ of 69 and was in the borderline range of intelligence, Dr. Rosen testified that the results of Ferguson's IQ test were deceptive because, Dr. Rosen said, Ferguson had purposefully not put an effort into the test in order to appear more troubled than he really was. Dr. Rosen stated that it was his belief that had Ferguson made an effort when taking the test, his IQ would have been in the middle to upper 70s. Clearly, the trial court did not err in not finding, as a nonstatutory mitigating circumstance, that Ferguson was mentally retarded."
Ferguson, 814 So.2d at 965. (Emphasis in original.)
In Penry, the United States Supreme Court stated:
 "If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, `evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'"
492 U.S. at 319 (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). As the Court of Criminal Appeals pointed out, the trial court's sentencing order contains several references to Ferguson's mental condition. These references are evidence that the trial court *Page 979 
did consider Ferguson's mental condition as both a possible statutory, and a nonstatutory, mitigating factor. Because the trial court properly considered this evidence, no conflict exists between the Court of Criminal Appeals' opinion and this Court's opinion in Henderson. The Court of Criminal Appeals determined this issue on settled caselaw that does not conflict with Penry or Henderson.
 IV. Other Nonstatutory Mitigating Circumstances
Ferguson also argues that the trial court erred by failing to consider or to give effect to several other nonstatutory mitigating circumstances that were offered. He contends that the trial court did not consider or give proper effect to evidence of: (1) his traumatic childhood; (2) his impaired ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law; (3) his acting under extreme duress or the substantial domination of another person; (4) his being under the influence of an extreme mental or emotional disturbance; (5) his acting as an accomplice to the murders and his claimed minor participation; (6) his codefendants' receiving lighter sentences; and (7) his showing of remorse for his actions. Ferguson contends that the Court of Criminal Appeals' affirmance is in conflict with the United States Supreme Court's decision in Woodson v. North Carolina, 428 U.S. 280
(1976), and its progeny, as to all of the offered mitigating circumstances that he alleges were not considered or were not given proper effect. In Woodson, the Supreme Court stated:
 "While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see Trop v. Dulles, 356 U.S. [86], at 100 [(1958)] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."
428 U.S. at 304, 96 S.Ct. 2978.
After reviewing the record and the Court of Criminal Appeals' opinion, we conclude that the trial court did not err in weighing the nonstatutory mitigating circumstances offered by Ferguson. As stated in the Court of Criminal Appeals' opinion, as long as the sentencing authority is not precluded from considering proffered mitigating circumstances, the protections provided by the Constitution are satisfied. See Lockett v.Ohio, Eddings v. Oklahoma, Ex parte Borden, and Ex parte Cochran, supra. Moreover, the Court of Criminal Appeals relied upon that settled law that "the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating." Williams v. State,710 So.2d 1276, 1347 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929 (1998). The Court of Criminal Appeals correctly affirmed as to the trial court's consideration of these nonstatutory mitigating circumstances. Although Ferguson correctly argues that these circumstances can be considered as mitigating, nothing in the record indicates the trial court was precluded from considering, or otherwise did not consider, these circumstances, as Ferguson argues.
 V. Conclusion
We have considered all of Ferguson's arguments, and we have reviewed the record for error, plain or otherwise; we have found no error that would warrant a reversal *Page 980 
of Ferguson's convictions or his sentence. We therefore affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
Moore, C.J., and Houston, See, Lyons, Brown, Woodall, and Stuart, JJ., concur.
Johnstone, J., concurs specially.