13 So.3d 418 (2008)
Thomas Dale FERGUSON
v.
STATE of Alabama.
CR-06-0327.
Court of Criminal Appeals of Alabama.
April 4, 2008.
Rehearing Denied May 23, 2008.
Certiorari Denied January 16, 2009.
Alabama Supreme Court 1071249.
*420 T. Thomas Cottingham III, Charlotte, North Carolina; and Vance E. Salter, Miami, Florida, for appellant.
Troy King, atty. gen., and Kevin W. Blackburn, asst. atty. gen., for appellee.
PER CURIAM.
The appellant, Thomas Dale Ferguson, currently an inmate on death row at Holman Penitentiary, appeals the circuit court's summary denial of his petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P.
In June 1998, Ferguson was convicted of four counts of capital murder for murdering Harold Pugh and his 11-year-old son, Joey Pugh. The jury recommended, by a vote of 11 to 1, that Ferguson be sentenced to life imprisonment without the possibility of parole. The circuit court chose not to follow the jury's recommendation and sentenced Ferguson to death. His convictions and sentence were affirmed on direct appeal. See Ferquson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). This Court issued the certificate of judgment for Ferguson's direct appeal on September 25, 2001.
On March 27, 2003, Ferguson filed a postconviction petition pursuant to Rule 32, Ala.R.Crim.P., attacking his convictions and sentence of death. In May 2005, Ferguson filed a motion requesting that his sentence be modified. In a 65-page order *421 the circuit court summarily denied the petition; this appeal followed.
The following facts surrounding the murders were set out by this Court on direct appeal:
"The State's evidence tended to show the following. On July 21, 1997, Harold Pugh and his 11-year old son Joey Pugh were reported missing to the Colbert County Sheriff's Department. Mike Sennett, a friend of the Pughs, testified that in the early evening hours of July 21, after hearing that the Pughs were missing, he and several friends went looking for the Pughs at Cane Creek in Colbert County. The local authorities and a rescue squad were also searching for the Pughs in this same area. Sennett testified that Harold and his son were avid fishermen. Making one more pass up Cane Creek in his boat before going home, Sennett found the bodies of Harold and Joey Pugh floating in the creek. Autopsies conducted the following day revealed that each victim had been shot twice in the head.
"Several days later, on July 26, 1997, a boat was found in a clearing in a remote wooded area in neighboring Franklin County. In the boat were rods and reels, a tacklebox, life jackets, a baseball-style cap with a wristwatch inside it (on the boat's front seat), and another baseball-style cap on the backseat. At Ferguson's trial, the individual who found the boat testified that because he had heard television and radio reports that the sheriff's department was looking for a boat, a description of which matched that of the boat he found in the wooded area, he telephoned the sheriff's department.
"Oscar Hood of the Colbert County Sheriff's Department testified that he received the call concerning the boat and that when he arrived at the location, the boat appeared to be the boat that the authorities were looking for in connection with the Pughs' murders. Hood ran a registration check on the boat and determined that it was in fact Harold Pugh's boat. Other testimony at trial showed that a pedestal-type seat had been removed from the boat and that two spent 9mm shell casings were found inside the boat.
"Further testimony revealed that on the day the victims' bodies were found, two armed men wearing dark-colored army fatigues, hooded shirts, sunglasses, and gloves had robbed the Deposit Guaranty National Bank in Belmont, Mississippi. An employee at the bark testified that she could not identify the men, but that she could identify the truck the men had fled in after the robbery. She described the truck as a black Chevrolet Z-71 pickup truck with a chrome toolbox in the rear bed. Shortly after the robbery, a truck matching that description was found by an officer of the Belmont Police Department five miles from the bank, in a heavily wooded area. The truck, which had been set on fire, was discovered after the police saw the smoke from the fire. On the front passenger-side floorboard of the truck, the police found a pedestal-type seat, which, according to testimony, was typical of the seats found in the front of bass-fishing boats.
"Following his arrest, Ferguson gave police a statement concerning his involvement in the robbery and murders of Harold and Joey Pugh and in the robbery of the bank in Mississippi. Ferguson told police that he and his four codefendantsMark Moore, Michael Craig Maxwell, Donald Risley, and Kino Grahamhad conspired to rob banks to get money. According to Ferguson, they bought clothing matching that described *422 by the employee of the bank robbed in Belmont, Mississippi, to wear during the robberies, and Moore also bought guns, handheld radios, and other items to use in the robberies. Ferguson told police that Moore was the `leader' of the group.
"In addition, Ferguson told police that on the day of the murders, he and the others were looking for two cars to steal to use in the Belmont bank robbery. According to Ferguson, while he, Moore, Maxwell, Graham, and Risley were looking for a car to steal, they saw the Pughs' truck parked near the boat landing at Cane Creek. When the Pughs arrived at the landing in their boat, Ferguson said, Harold Pugh got out of the boat and into his truck. According to Ferguson, before he knew it, Maxwell was holding a gun to the Pughs and was ordering the Pughs to get back into the boat. Ferguson said that Maxwell jumped into the boat, along with Moore, and that Moore then ordered Ferguson to get into the boat. According to Ferguson, Maxwell was armed with a 9mm pistol and Moore was armed with a .357 pistol. Ferguson maintained that he did not have a weapon. Ferguson stated that they then left in the boat with the victims, heading downstream, while Risley and Graham waited with the truck. According to Ferguson, he heard a shot and saw that Maxwell had shot Harold Pugh. Ferguson claimed that he did not know who shot Joey Pugh, but he did say that Maxwell and Moore threw the victims' bodies into the creek.
"Ferguson stated that after the shooting he became physically ill and that he was throwing up and very upset. Ferguson further stated that after the murders, Moore threatened him, telling Ferguson that if he told anyone about what had happened, he would kill Ferguson and Ferguson's family.
"Ferguson stated that after returning the boat to the landing where Graham and Risley were waiting, he and the others then loaded the boat onto the trailer and drove the Pughs' truck and the boat to a clearing in the woods in Franklin County. Ferguson said that he removed a pedestal-type seat from the boat and threw it inside the victims' truck.
"The following morning, according to Ferguson, Moore came to his house and the two left together to pick up Risley. Then, Ferguson said, they went to Maxwell's apartment where everyone, except Graham, who did not come to Maxwell's apartment, discussed plans to rob the bank in Belmont, Mississippi. Ferguson stated that Maxwell and Risley, who, according to Ferguson, were going to be the ones to go inside the bank, left Maxwell's apartment in Maxwell's car, followed by him and Moore in Moore's truck, and drove to where they had left the victims' truck and boat. From that location, Ferguson said, Risley drove the victims' truck to Belmont, and Maxwell drove his own car, while he and Moore followed in Moore's truck. Maxwell stated that he and the other men then drove to a location in Belmont, near the bank, where they left Maxwell's car. From there, Ferguson said, Maxwell and Risley drove the victims' truck to the bank as he and Moore, who were to act as `covers' while the bank was being robbed, followed in Moore's truck. Ferguson stated that after Maxwell and Risley had committed the robbery, Maxwell drove the victims' truck back to the location where they left Maxwell's car, and he and Moore met them at that location. Ferguson said that they put their guns in Moore's truck, and put the clothes they had worn in the robbery in the victims' truck. According to Ferguson, *423 Risley then poured gasoline on the victims' truck and set it on fire. Ferguson stated that he and the others then returned to Maxwell's apartment, where they divided the proceeds of the bank robberyapproximately $40,000.
"Shortly after the questioning ended and Ferguson had completed his statement, Ferguson told Investigator Frank Brians that he had something else he wanted to say. Ferguson then stated that he had lied in his earlier statement when he said that Moore was at Cane Creek and on the boat when the Pughs were murdered. Ferguson now said that Moore was not at Cane Creek and that Moore was not on the boat when the victims were shot, but that only Ferguson and Maxwell were on the boat with the victims. Ferguson, who still maintained that he was not armed while on the boat, now claimed that Maxwell shot both victims.
"Donald Risley, one of Ferguson's codefendants, testified at Ferguson's trial and corroborated most of Ferguson's statement to police. Risley's wife and Ferguson's wife were first cousins, and Risley had been friends with Ferguson for approximately eight years. Risley testified that Ferguson had approached him and asked him if he wanted to get involved in the plan to rob banks to get some `easy money.' (R. 510.) Risley stated that Moore and Maxwell were the 'leaders of the group.' (R. 514.) Risley, like Ferguson, testified concerning the circumstances surrounding the murders at Cane Creek and the bank robbery in Belmont. Risley testified that on the afternoon of the murders, Ferguson picked him up at a friend's, Daryl May's, house and that he and Ferguson then went to Maxwell's apartment. From there, Risley said, they went to Cane Creek where they saw the victims' truck parked at the boat landing. Risley stated that he was armed with a .357 pistol, that Maxwell had a 9mm pistol, that Graham had a Colt .45 pistol, and that Ferguson was carrying a .357 pistol. Testifying to essentially the same facts as Ferguson did concerning how they approached the Pughs and ordered them into the boat, Risley further testified that Maxwell and Ferguson got into the boat with the victims and Maxwell drove the boat downstream. Risley said that the victims were sitting in the back of the boat, while Ferguson was standing near the front and was pointing a gun at the Pughs. Risley testified that neither he nor Ferguson were threatened into robbing the Pughs and that no one threatened Ferguson to get him to get into the boat. According to Risley, when Ferguson and Maxwell returned in the boat, approximately 10 minutes after they had left, neither victim was in the boat and Ferguson was sitting on a pedestal-type seat in the front of the boat.
"Risley continued to testify to the events that occurred after the murders up until the time of the robbery of the bank in Mississippi. Risley testified to essentially the same facts as did Ferguson in his statement to police. Risley stated that Ferguson took the pedestal-type seat out of the boat and put it in the truck because, Risley said, Ferguson was afraid that he might have touched it and left his fingerprints on it. Risley also stated that while he was at Cane Creek, Ferguson never appeared to be sick or upset, and he never saw Ferguson throw up. Risley further told police that several days after the murders, Ferguson, in response to Risley's question whether he had shot the Pughs, said that he had and further told Risley that he and Maxwell had shot them because they did not want any witnesses. Ferguson also told Risley that he shot Harold *424 Pugh and that Maxwell shot Joey Pugh. Maxwell, who was also present during Risley's and Ferguson's conversation about the shooting, told Risley that Harold was not dead after the first shot, so he shot him again and he made Ferguson shoot Joey again.
"Other evidence at trial showed that the 9mm pistol police took from Moore's house was the weapon that fired at least one of the bullets recovered from Harold Pugh's body. The two spent shell casings found in the boat were also fired by the 9mm pistol recovered from Moore's house. The evidence further showed that one of the bullets recovered from Harold's body and one of the bullets recovered from Joey's body were lead semi-wad cutter bullets that could be loaded in either a .38 or .357 pistol. Although the State's firearms expert could not conclusively state that a .357 pistol taken from Moore's house was the weapon that fired two of the bullets recovered from the victims' bodies, he was able to say that the pistol was the type of pistol that could fire that particular type of bullet. The State's firearms expert also testified that a bag of ammunition, which had been taken from Ferguson's house and submitted to him for evaluation, contained ammunition that was capable of being fired through the.357 pistol recovered from Moore's house.
"There was also testimony that Ferguson, Maxwell, Graham, and Moore had all worked together at a furniture distribution center in Russellville, in Franklin County, Alabama. All of the men, except Graham, quit their jobs, or failed to return to work, in the early to middle part of July 1997, just several weeks before the Pughs' murders and the bank robbery in Belmont. Graham last reported to work on August 20, 1997. Also, Daryl May, a friend and coworker of Ferguson's, testified that on the afternoon of the murders, Maxwell came to his house to pick up Ferguson, who was watching television there. May also testified that because Risley did not have a car, he drove him to work every morning, except the morning of July 21, the day after the murders. May said that Risley did not show up for work that morning. Testimony also showed that in late July 1997, shortly after the bank robbery in Belmont, Ferguson paid $1,750 in cash for a used car, using `new' $20 bills."
Ferguson v. State, 814 So.2d at 934-37 (footnotes omitted).

Standard of Review
When reviewing a circuit court's ruling on a Rule 32 petition, we apply an abuse-of-discretion standard. Reed v. State, 748 So.2d 231 (Ala.Crim.App.1999). On direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a Rule 32 proceeding attacking a death sentence. See Hill v. State, 695 So.2d 1223 (Ala.Crim.App.1997).
This proceeding was initiated by Ferguson. Thus, Ferguson has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle [him] to relief." Rule 32.3, Ala. R.Crim.P.
In Boyd v. State, 913 So.2d 1113 (Ala. Crim.App.2003), this Court stated the following concerning Rule 32.6(b), Ala. R.Crim.P.:
"`Rule 32.6(b) requires that the petition itself disclose the facts relied upon in seeking relief.' Boyd v. State, 746 So.2d 364, 406 (Ala.Crim.App.1999). In other words, it is not the pleading of a conclusion `which, if true, entitle[s] the petitioner to relief.' Lancaster v. State, 638 *425 So.2d 1370, 1373 (Ala.Crim.App.1993). It is the allegation of facts in pleading which, if true, entitles a petitioner to relief. After facts are pleaded, which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as provided in Rule 32.9, Ala. R.Crim.P., to present evidence proving those alleged facts."
913 So.2d at 1125.

I.
Ferguson first argues that the Alabama Supreme Court's decisions in Ex parte Carroll, 852 So.2d 833 (Ala.2002), and Ex parte Tomlin, 909 So.2d 283 (Ala.2003), apply retroactively to his sentence because they clarified the weight a trial court in a capital case must give to a jury's recommendation of a sentence of imprisonment of life without the possibility of parole. He asserts that based on the number of jurors who recommended a sentence of life without the possibility of parole and the fact that the court did not cite in its sentencing order any facts not known to the jury, he is entitled to be sentenced to life imprisonment without the possibility of parole.
The record shows that in May 2005, about two years after Ferguson filed his original Rule 32 petition, Ferguson filed a motion asking the court to apply Carroll and Tomlin to his sentence. This motion appeared to be, and apparently was treated as, an amendment to Ferguson's Rule 32 petition.[1]
When denying relief on this claim, the circuit court stated:
"On or about May 26, 2005, Ferguson filed a motion to vacate his sentence based upon the Supreme Court of Alabama's decisions in Ex parte Tomlin, [909 So.2d 283] (Ala.2003), and Ex parte Carroll, 852 So.2d 833 (Ala.2002). Ferguson argues that under these decisions, his sentence of death must be vacated because this Court failed to give the jury's recommendation of life without parole `great weight.' (Mot. at 3) The Alabama Supreme Court's decisions in Ex parte Tomlin and Ex parte Carroll, however, have no applicability in these proceedings. Neither decision was issued until well after Ferguson's direct appeal became final. As such, Ferguson's argument is without merit.
"Ferguson's certificate of judgment was issued by the Court of Criminal Appeals on September 25, 2001. Ferguson's petition for a writ of certiorari to the United States Supreme Court was denied on March 4, 2002. Ex parte Carroll was released by the Supreme Court of Alabama in July of 2002 and Ex parte Tomlin was released in October of 2003. Thus, the direct appeal of Ferguson's capital murder convictions and sentence of death were concluded prior to the Supreme Court of Alabama's decision in Ex parte Carroll and two years prior to [its] decision in Ex parte Tomlin.

"Ferguson appears to argue that Carroll should be applied retroactively to his case. Ferguson fails to acknowledge, however, that Tomlin and Carroll only apply to cases on direct appeal. Nothing in Carroll or Tomlin raises the slightest inference that the Supreme Court of Alabama intended these decisions to be applied retroactively to cases beyond direct appeal. See Ex parte Love, 507 So.2d 979, 980 (Ala.1987)(holding that `the Batson [v. Kentucky, 476 *426 U.S. 79 (1986),] decision should not be applied retroactively on collateral review of convictions that became final prior to its announcement'); see also Barbour v. State, [903 So.2d 858] (Ala.Crim.App. June 25, 2004) (holding that `Barbour's contention that the rule in Apprendi v. New Jersey[, 530 U.S. 466 (2000)]and by extension, the rule in Ring v. Arizona[, 536 U.S. 584 (2002)]apply retroactively to his death sentence is without merit').
"As such, the procedural bars of Rule 32 of the Alabama Rules of Criminal Procedure apply to this claim. As such, this claim is procedurally barred from review because the substance of this claim could have been but was not raised or addressed at trial. Rule 32.2(a)(3) Ala.R.Crim.P., and Alabama caselaw provides that relief cannot be given on a claim which could have been raised or addressed at trial but was not. Moreover, this claim is also procedurally barred from review because the substance of this claim could have been but was not raised or addressed on appeal. Rule 32.2(a)(5), Ala. R.Crim. P. and Alabama case law provide that relief cannot be given on a claim that could have been but was not raised or addressed on appeal."
(C.R. 502-04.)
In Ex parte Taylor, 808 So.2d 1215 (Ala. 2001), the Alabama Supreme Court discussed Alabama's judicial-override statute, codified at § 13A-5-47(e), Ala.Code 1975,[2] and held that before the court overrides a jury's recommendation it must set out specific reasons why it chose to do so. The court stated:
"This Court held in Ex parte Jones, 456 So.2d 380 (Ala.1984), that the Constitution of the United States does not require the `[adoption of] specific limitations on the trial court's power to override the jury's advisory verdict' and that Alabama's capital-sentencing procedure provides sufficient protection for capital defendants because `[t]he whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation' of life imprisonment. 456 So.2d at 382. Under Alabama's capital-sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties. § 13A-5-47(d), Ala.Code 1975. In making these findings, the trial judge must consider a jury's recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala.Code 1975 (`in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict'). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it. McCausland v. Tide-Mayflower Moving & Storage, 499 So.2d 1378, 1382 (Ala.1986) (stating that subsections of a statute `should be *427 construed together to ascertain the meaning and intent of each')."
808 So.2d at 1219 (footnote omitted).
The Alabama Supreme Court in Ex parte Carroll reviewed a circuit court's decision to override a jury's 10-2 recommendation of life imprisonment without the possibility of parole. That Court, in reversing this court's decision affirming the trial court's judgment, stated:
"We take this opportunity to further explain the effect of a jury's recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the `triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.
"Based on an appellate court's duty to independently weigh the aggravating and mitigating circumstances in a capital case, and treating the jury's recommendation as a mitigating circumstance in this case, we conclude that the trial court's override in this case of the jury's recommended sentence of life imprisonment without parole and that court's subsequent sentence of death were improper under the circumstances presented here. See § 13A-5-53(a) and (b), Ala.Code 1975. Here we have overwhelming support of a sentence of life imprisonment without the possibility of parole, as evidenced by the jury's vote of 10-2 for such a sentence. Furthermore, Justice Houston in a special writing in [Ex parte] Carroll [, 852 So.2d 821 (Ala. 2001),] ably marshaled all of the factors that make the sentence of death in this case excessive and disproportionate.
"`Given the jury's recommendation of life imprisonment without parole; the recommendation of the victim's family that the defendant be sentenced to life imprisonment without parole; the fact that the defendant was 17 years old when he committed the crime; and the circumstances of the crime (particularly that the defendant made no attempt to kill the witnesses to the crime), ... the sentence of death is excessive and disproportionate."
"852 So.2d at 828 (Houston, J., concurring in part and dissenting in part). Because of Carroll's age at the time of the offense, his lack of a significant criminal history, and the recommendation of the victim's family that he be sentenced to life imprisonment without parole, the jury's 10-2 recommendation that he not be sentenced to death tips the scales in favor of following the jury's recommendation. We therefore reverse the judgment of the Court of Criminal Appeals as to Carroll's sentence and remand the case for that court to instruct the trial court to resentence Carroll following the jury's recommendation of life imprisonment without the possibility of parole."
852 So.2d at 836-37.
Later in Ex parte Tomlin, the Alabama Supreme Court reversed the judgment of this Court and set aside a judicial override of a unanimous recommendation of life imprisonment without the possibility of parole. The Court stated:

*428 "`[T]he death penalty should be carried out only after this Court has found it appropriate to do so by independently weighing the aggravating and mitigating circumstances.' Ex parte Hays, 518 So.2d 768, 780 (Ala.1986) (opinion on rehearing). Therefore, while the trial court, acting without the guidance offered by Carroll, gave `serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,' we are compelled to treat the jury's recommendation as a mitigating circumstance. Indeed, we must give that mitigating circumstance great weight.
"`The weight to be given [a jury's recommendation of life imprisonment without the possibility of parole] should depend upon the number of jurors recommending a sentence of life imprisonment without parole.' [Ex parte] Carroll, 852 So.2d [833] at 836 [(Ala.2002)]. In Carroll, we found that a jury's 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated `overwhelming support' of such a sentence. 852 So.2d at 837. Therefore, it is only logical to conclude that a unanimous recommendation like the one here provides even more `overwhelming support' of such a sentence and, therefore, must be afforded great weight.
"`The weight to be given [a jury's recommendation of life imprisonment without the possibility of parole] should depend ... also upon the strength of the factual basis for such a recommendation in the form of information known to the jury.' Carroll, 852 So.2d at 836. Here, the State does not question `the strength of the factual basis for [the jury's] recommendation.' Indeed, the State argues only that `the [trial] court considered factual information known to the jury in finding the existence of one aggravating factorfirst degree murder wherein two persons were killed.' State's brief, at 34-35. Thus, we must conclude that the jury's recommendation rested upon an adequate factual basis.
"`[T]he jury's recommendation [of life imprisonment without the possibility of parole] may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.' Carroll, 852 So.2d at 836. Here, the trial court overrode the jury's recommendation, because `[t]he other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first degree murder of the same two people and [was] sentenced to death.' Although the jury was not aware of Daniels's sentence, his sentence cannot properly be used to undermine a mitigating circumstance.
"As noted in the State's brief, `Tomlin... argues ... that the trial court erred in considering his co-defendant's sentence because it is not an aspect of Tomlin's character or of the crime.' State's brief, at 37. The State admits that `Tomlin's reasoning is correct to the extent that he argues that his co-defendant's sentence should not be treated as a mitigating or aggravating circumstance. It is not an aspect of [Tomlin's] character or of the crime.' State's brief, at 37-38. It would be inconsistent with the State's admission for this Court to hold that Daniels's sentence could properly be used to undermine the jury's recommendation of life imprisonment without the possibility of parole. See Coulter v. State, 438 So.2d 336, 345 (Ala. Crim.App.1982), aff'd, 438 So.2d 352 (Ala.1983) (`In the sentencing phase of the trial, the fact that an alleged accomplice did not receive the death penalty is no more relevant as a mitigating factor *429 for the defendant than the fact that an alleged accomplice did receive the death penalty would be as an aggravating circumstance against him.') (emphasis added)."
909 So.2d at 286-87.
In neither Carroll nor Tomlin did the Alabama Supreme Court give any indication that those decisions were to be applied retroactively to all cases, even those cases that were final when the decisions in Carroll and Tomlin were announced. These decisions were applied to all cases that were currently pending on direct appeal. See Ex parte Mathis, 594 So.2d 692 (Ala. 1991).
The Alabama Supreme Court in Ex parte Harris, 947 So.2d 1139 (Ala.2005), recognizing that cases on collateral review are in a different procedural posture than cases pending on direct appeal when a judicial decision is announced, adopted the Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), standard, and stated:
"In Teague v. Lane, 489 U.S. 288, 304, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the United States Supreme Court restated its reasons for applying its most current interpretation of federal constitutional law to only those cases that are still subject to that Court's direct review, either on certiorari review of state-court proceedings affirming a judgment of conviction on direct appeal or directly from a United States Circuit Court of Appeals:
"`In Griffith v. Kentucky, 479 U.S. 314 (1987), we rejected as unprincipled and inequitable the Linkletter [v. Walker, 381 U.S. 618 (1965),] standard for cases pending on direct review at the time a new rule is announced, and adopted the first part of the retroactivity approach advocated by Justice Harlan [in Mackey v. United States, 401 U.S. 667, 675 (1971) (Harlan, J., concurring in judgments in part and dissenting in part); and Desist v. United States, 394 U.S. 244, 256 (Harlan, J., dissenting)]. We agreed with Justice Harlan that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." 479 U.S., at 322. We gave two reasons for our decision. First, because we can only promulgate new rules in specific cases and cannot possibly decide all cases in which review is sought, "the integrity of judicial review" requires the application of the new rule to "all similar cases pending on direct review." Id., at 323. We quoted approvingly from Justice Harlan's separate opinion in Mackey, supra, 401 U.S., at 679:
"`"`If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all.... In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation.'" 479 U.S., at 323.'
"(Emphasis added.) Thus, the United States Supreme Court has determined that, as a judicial body, it must consider its most current interpretation of federal constitutional law in disposing of cases arising from direct review, as opposed to collateral review of a postconviction petition, i.e., it considers its most current interpretation in cases petitioning for the writ of certiorari to the lower appellate *430 court seeking review of the affirmance of a conviction by such court on direct appeal. That is precisely what this Court did when we decided Harris's Batson [v. Kentucky, 476 U.S. 79 (1986),] claim on direct appeal from the judgment of conviction based on Harrell [v. State, 571 So.2d 1270 (Ala.1990)], which was our most current interpretation of what federal constitutional law required at the time.
"The United States Supreme Court continued in Teague:

"`Second, because "selective application of new rules violates the principle of creating similarly situated defendants the same," we refused to continue to tolerate the inequity that resulted from not applying new rules retroactively to defendants whose cases had not yet become final. [Griffith v. Kentucky, 479 U.S. 314], at 323-324 [(1987)] (citing Desist [v. United States], 394 U.S. [244], at 258-259 [(1969)] (Harlan, J., dissenting)).'"
"489 U.S. at 304, 109 S.Ct. 1060. The `similarly situated defendants' the United States Supreme Court considers itself bound to treat the same are defendants who can still come before that Court on certiorari review of an appeal from a final judgment of conviction or from a decision of a United States Court of Appeals. The term does not include petitioners whose judgments of conviction have previously been affirmed or have otherwise become final and who are now collaterally attacking the conviction in a postconviction proceeding. In fact, the United States Supreme Court refused, in Allen v. Hardy, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), to apply Batson retroactively to a petitioner appearing before that Court on collateral review of a previous final judgment of conviction. The procedural posture of the postconviction petitioner in relation to the United States Supreme Court in Allen is analogous to Harris's posture in relation to this Court in the instant case. Neither the United States Supreme Court's rationale in Griffith for applying its most current interpretation of federal constitutional law to cases pending before it, nor the definition of a `final' case in Griffith compels the application of Thomas to Harris's Batson claim. Rather, for purposes of Harris's argument that Thomas applies, we conclude that her conviction was final when this Court decided Thomas. Therefore, Harris's case is distinguishable from those cases she cites indicating that Thomas should apply retroactively only to convictions not yet final."
947 So.2d at 1145-46. See also Ex parte Love, 507 So.2d 979 (Ala.1987) (Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), does not apply retroactively to cases on collateral review); Hunt v. State, 940 So.2d 1041 (Ala.Crim.App. 2005) (Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), does not apply retroactively to cases on collateral review); McWilliams v. State, 897 So.2d 437 (Ala.Crim.App.2004) (Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not apply retroactively to cases on collateral review); and Matthew R. Doherty, The Reluctance Towards Retroactivity: The Retroactive Application of Laws in Death Penalty Collateral Review Cases, 39 Val. U.L.Rev. 445 (2004). Cf. Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005) (Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), apply retroactively to cases on collateral review because they meet the Teague v. Lane test.)
Before a judicial decision is applied retroactively to cases on collateral review it must meet one of two criteria:

*431 "First, a new rule should be applied retroactively if it places `certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.' Mackey [v. United States], 401 U.S. [667], at 692 [(1971)]. Second, a new rule should be applied retroactively if it requires the observance of `those procedures that ... are "implicit in the concept of ordered liberty."' Id., at 693, 91 S.Ct., at 1180 (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed.2d 288 (1937) (Cardozo, J.))."
489 U.S. at 307, 109 S.Ct. 1060. The Supreme Court noted the difficulty in applying a new rule of law to a collateral proceeding:
"The `costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus ... generally far outweigh the benefits of this application.' [Solem v.] Stumes, 465 U.S. [638], at 654, 104 S.Ct. [1338], at 1347 [(1984)] (Powell, J., concurring in judgment). In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, cf. Younger v. Harris, 401 U.S. 37, 43-54, 91 S.Ct. 746, 750-755, 27 L.Ed.2d 669 (1971), for it continually forces the State to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards."
489 U.S. at 310, 109 S.Ct. 1060.
Though we are doubtful that Carroll or Tomlin apply retroactively to cases on collateral review, we believe that this question is best left to the Alabama Supreme Court.[3]
Nonetheless, even if Carroll and Tomlin applied to Ferguson's case, the circuit court complied with those decisions when it chose to override the jury's recommendation and sentence Ferguson to death. When sentencing Ferguson to death, the circuit court stated:
"The Court does find that the jury's recommendation of life imprisonment without parole is a mitigating factor and the Court has considered said mitigating factor at the sentence hearing. However, the jury was allowed to hear an emotional appeal from the defendant's wife. The Court further finds that the defendant's problems during his childhood are not a mitigating factor.
"There was also evidence presented to the jury that Mark Moore was the instigator of the killings of Harold and Joey Pugh, but that fact alone does not make the defendant any less culpable and is not a mitigating factor. The defendant was able and capable to make choices.
"The Court has also considered the Pre-Sentence Investigation Report as set out in Section 13A-5-47, Code of Alabama, as amended, in determining a sentence in this case.
"The Court having considered the aggravating circumstances and the mitigating circumstances, finds that the aggravating circumstances due to the nature of the crime and the defendant's *432 involvement in it outweighs the mitigating circumstances presented, and the mitigating factor that the jury recommended a sentence of life imprisonment without parole and the vote was 11 for life and 1 for death.
"The Court does find that there is a reasonable basis for enhancing the jury's recommendation of life imprisonment without parole for the reasons stated herein, and this was a murder of [an] adult man and his young son during a robbery, and the defendant had the opportunity to reflect and withdraw from his actions and chose not [to] do so; that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired."
The circuit court's sentencing order, although issued before the decisions in Carroll and Tomlin, fully complies with those decisions by stating the specific reasons the circuit court gave the jury's recommendation the weight it gave it and by treating the jury's recommendation as a mitigating circumstance. Carroll and Tomlin do not state that a court must give "considerable" or "great" weight to the jury's recommendation of life imprisonment without parole whenever the vote in favor of life without parole is 10 or greater. Nor do we agree with Ferguson that we should expand the Supreme Court's holdings in Carroll and Tomlin. The holdings in those cases were fact specific and should not be applied broadly in this case to "tip[] the scales in favor of following the jury's recommendation." Carroll, 852 So.2d at 837.
As we stated in Sneed v. State, 1 So.3d 104, 116 (Ala.Crim.App.2007):
"In Ex parte Carroll, the Supreme Court held that a jury's recommendation of imprisonment for life without the possibility of parole must be considered as a mitigating circumstance. Although the Supreme Court also stated that a jury recommendation could be overridden based on information that was not known to the jury, it did not state that that was the only circumstance in which a jury recommendation could be overridden.
"In this case, the trial court considered the jury's recommendation as a nonstatutory mitigating circumstance and gave it moderate weight. It then stated specific reasons for giving the jury's recommendation the consideration it gave it, including the appellant's participation in the robbery-murder and the jury's vote. Therefore, we conclude that the circuit court complied with both Ex parte Taylor and Ex parte Carroll in overriding the jury's recommendation."
See also McGowan v. State, 990 So.2d 931, 1006 (Ala.Crim.App.2003) (opinion on return to remand) ("Here, there was no conflicting evidence about who committed the murders, nor did the victims' family ask that McGowan be sentenced to life imprisonment without parole. The circuit court's findings as set out above are sufficient to comply with the dictates of Taylor and Carroll. See Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001).").
Under the particular circumstances presented in this case, the circuit court complied with Taylor, Carroll, and Tomlin in overriding the jury's recommendation and sentencing Ferguson to death, and Ferguson's claim in his Rule 32 petition that application of those cases to his case requires that he be resentenced to life imprisonment without parole is without merit.

II.
Ferguson argues that he is entitled to an evidentiary hearing on his claim that he is mentally retarded. He asserts that according *433 to the United States Supreme Court's decision in Atkins v. Virginia, supra, he may not be sentenced to death because he is mentally retarded.[4] Ferguson contends that there is more evidence of mental retardation than merely his IQ scores. Specifically, he asserts that his school records show that he is mentally retarded.
Ferguson is correct that this Court has held that the United States Supreme Court's decision in Atkins v. Virginia applies retroactively to cases on collateral review. See Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005). Thus, Atkins applies to this case.
The Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002), adopted the most liberal definition of mental retardation used by those states that had laws prohibiting the execution of the mentally retarded. The following three factors must be considered: (1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems must have occurred during the developmental years, i.e., before the age of 18. See Perkins.
The circuit court, when addressing this claim, made the following findings:
"Ferguson does not meet either the intelligence or adaptive functioning elements necessary to establish mental retardation. Ferguson has been administered intelligence testing on numerous occasions throughout his life, both prior to and after his conviction for capital murder. At the age of 6, Ferguson was administered the Stanford-Binet intelligence test and obtained a full scale score of 77. (C.R. 164.) At the age of 12, Ferguson was administered the Wechsler Intelligence Scale for Children-Revised (WISC-R) and obtained a verbal score of 74, a performance score of 71, and a full-scale score of 71. (C.R. 148-149.) It was noted by the examiner of the WISC-R that Ferguson appeared to give up easily when taking the test, indicating he could have scored even higher. (C.R. 149.) Based on Ferguson's score, he was placed in classes for the educable mentally retarded. (C.R. 164.)
"However, when Ferguson was retested three years later, he obtained a verbal score of 87, a performance score of 88, and a full-scale score of 87. (C.R. 178.) These scores placed Ferguson within the low average range of intellectual functioning. (C.R. 179.) Based in part on those test scores and others, Ferguson was moved out of classes for the educable mentally retarded and into classes for the learning disabled. (C.R. 191.) A school official noted at the time that there was a discrepancy between Ferguson's ability and achievement in school. (C.R. 191.) The clear import of the comment is that Ferguson was an underachiever in school.
"After being charged with capital murder, Ferguson was examined by court-appointed forensic psychologist Stephen Rosen. (R. 836.) Dr. Rosen administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R). (R. 844.) Ferguson obtained a verbal score of 76, a performance score of 66, and a full-scale score of 69. (R. 844.) This score would place Ferguson within the upper bounds of mild retardation. However, *434 Dr. Rosen testified that Ferguson did not give a good effort on the test. (R. 843.) Dr. Rosen surmised that if Ferguson had tried on the test he would have actually scored in the mid to upper 70's. (R. 845.) In Dr. Rosen's opinion, Ferguson was not mentally retarded. (R. 844.)
"Dr. Rosen's opinion was supported by Ferguson's own expert psychologist, Dr. James F. Chudy. While testifying on behalf of Ferguson during the penalty phase of his trial, Dr. Chudy agreed that Ferguson was not mentally retarded. (R. 806.) Rather, based on his own testing, Dr. Chudy opined that Ferguson's intellectual functioning was somewhere in the borderline range. (R. 792, 806, C.R. 331.)
"As discussed earlier, the Alabama Supreme Court has stated that a full-scale IQ of 72 `seriously undermines any conclusion that Smith suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions.' [Ex parte] Smith, [Ms. 1010267, March 14, 2003] at 9[, ___ So.3d ___ (Ala.2003)]. In another case, the Alabama Supreme Court likewise applied a cutoff of 70 or below in determining that an individual with a full-scale IQ of 76 is not mentally retarded. [Ex parte] Perkins, [851 So.2d 453] at 456 [(Ala.2002)]. The Court of Criminal Appeals, pursuant to Perkins, found that two full-scale IQ scores of 77 and 78 `revealed an IQ well above 70 an IQ that is above the significant subaverage' range. Stallworth [v. State], 868 So.2d [1128] at 1182 [(Ala.Crim.App.2001)] (citation omitted).
"There is no doubt that Ferguson's IQ lies somewhere in the mid 70's to lower 80's and is best classified as borderline to low average intellectual functioning. Therefore, Ferguson's IQ is above the `significant subaverage' range required for a finding of mental retardation.
"Moreover, the Court of Criminal Appeals noted in its decision on direct appeal the following regarding Ferguson's claim of mental retardation:
"`Moreover, contrary to Ferguson's contention, we find no evidence in the record indicating that Ferguson was mentally retarded. In fact, both Ferguson's expert, Dr. Chudy, and the expert, Dr. Rosen, stated unequivocally that Ferguson was not mentally retarded. Although there was evidence that Ferguson had an IQ of 69 and was in the borderline range of intelligence, Dr. Rosen testified that the results of Ferguson's IQ test were deceptive because, Dr. Rosen said, Ferguson had purposefully not put an effort into the test in order to appear more troubled than he really was. Dr. Rosen stated that it was his belief that had Ferguson made an effort when taking the test, his IQ would have been in the middle to upper 70s. Clearly, the trial court did not err in not finding, as a nonstatutory mitigating circumstance, that Ferguson was mentally retarded.'
"Ferguson v. State, 814 So.2d at 965. As such, the Atkins [v. Virginia, 536 U.S. 304 (2002),] decision does not affect Ferguson's death sentence.
"Out of an abundance of caution, the Court will also briefly discuss evidence concerning whether Ferguson exhibits significant or substantial deficits in adaptive functioning. As discussed earlier, to be diagnosed as mentally retarded, an offender must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community *435 resources, self-direction, functional academic skills, work, leisure, health, and safety. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, at p. 41.
In assessing an offender's adaptive functioning, the state appellate courts have looked to a myriad of factors in determining whether one is mentally retarded and therefore exempt from the death penalty. Perkins, 851 So.2d at 456; Smith, [___ So.3d at ___]; Stallworth, 868 So.2d at 1182. Among these factors are: employment history, the ability to have interpersonal relationships, being extensively involved in criminal activity and post-crime craftiness or the part of the criminal. The record demonstrates that all of these factors apply to Ferguson and establish that he is not mentally retarded.
"Prior to his arrest, Ferguson had held many jobs, including working at a chicken plant for one year and a sand processing plant. (C.R. 92,329.) Ferguson also worked at Helig-Meyers. While there, Ferguson even obtained a promotion from loading trucks to operating machinery. (R. 823.) Clearly, Ferguson was able to seek out and maintain employment.
"Ferguson also has the ability to develop and sustain interpersonal relationships with others. During the penalty phase, Ferguson's wife testified that at the time of the murders, she and Ferguson had been married for almost five years. (R. 811.) Ms. Ferguson described him as a good husband who provided for her and supported her while she was in nursing school. (R. 811-812.) Moreover, Ferguson's actions before, during, and after the crime support the conclusion that he is a street-wise criminal intent on minimizing his culpability and establishing a defense to his crime. This conduct strongly indicates that Ferguson does not have substantial deficits in adaptive functioning. Ferguson was an active member in a criminal gang that planned and carried out not only the murders of Harold and Joey Pugh but also a bank robbery. Ferguson had also been convicted of forging checks. Additionally, during his psychological evaluation with Dr. Chudy, Ferguson admitted that he had sold drugs for money. (C.R. 92, 117.)
"Finally, Ferguson's post-crime actions further demonstrate that he does not possess severe deficits in adaptive functioning. Ferguson gave a statement to investigators in which he repeatedly attempted to deceive and mislead authorities as to the extent of his involvement in the murders. Ferguson admitted that he removed the seat from the victim's boat and burned it, explaining that he was worried that he had left fingerprints on the seat. Ferguson's actionshis destroying evidence and misleading authoritiesdemonstrate a high level of adaptive functioning.
"In sum, Ferguson has not and cannot meet his burden of demonstrating that he is `so impaired as to fall within the range of mentally retarded about whom there is a national consensus.' Atkins, 536 U.S. at 317. It is clear from his school records and the testimony of both Drs. Rosen and Chudy that Ferguson is not mentally retarded. The Court concludes that Ferguson is not mentally retarded. Thus, his Atkins claim is without merit, and is summarily dismissed by the Court. Ala. R.Crim. P. 32.7(d)."
(C.R. 450-54.)
We have reviewed the record of Ferguson's direct appeal and the record of the postconviction proceedings, and we conclude that the circuit court's findings are *436 more than supported by the record. It is clear that Ferguson does not meet the most liberal definition of mental retardation adopted by the Alabama Supreme Court in Perkins. The circuit court did not err in declining to hold a hearing on Ferguson's claim that he is mentally retarded.

III.
Ferguson next argues that the court hearing his Rule 32 petition erred in summarily dismissing his claims of ineffective-assistance-of-counsel. He lists several different grounds in support of this contention. However, claims presented in a Rule 32 petition but not argued in brief are deemed abandoned. See Brownlee v. State, 666 So.2d 91 (Ala.Crim.App.1995).
"To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel's performance was deficient and (2) that he was prejudiced as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
"`The appellant must show that his counsel's performance was unreasonable, considering all of the attendant circumstances.... "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.'
"Duren v. State, 590 So.2d 360, 362 (Ala. Cr.App.1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied, [503] U.S. [974], 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
"When this court is reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Luke v. State, 484 So.2d 531, 534 (Ala.Cr.App.1985). The burden is on the appellant to show that his counsel's conduct was deficient. Luke.

"`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.) Ex parte Lawley, 512 So.2d 1370, 1372 ([Ala. 1987]).
"Initially we must determine whether counsel's performance was deficient. We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. 'Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable....' Lawley, 512 So.2d at 1372. This court must *437 avoid using `hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance. Falkner v. State, 586 So.2d 39 (Ala.Cr.App.1991)."
Hallford v. State, 629 So.2d 6, 8-9 (Ala. Crim.App.1992).
"The purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (`We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that `[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or `what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)."
Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (footnote omitted). Finally,
"[i]n Strickland [v. Washington, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a `defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."
Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

A.
First, Ferguson contends that the attorney who represented him when he made his statement to police rendered ineffective assistance because, he says, counsel failed to advise him of his rights, encouraged him to make a statement, told him it would better for him if he made a statement, and failed to consider Ferguson's drug use and mental facilities at the time he made the statement.
In its order dismissing relief on this claim, the court hearing Ferguson's Rule 32 petition stated:
"On pages 13-20 of his petition, Ferguson claims that during his interviews with police, his attorney ... was ineffective. Ferguson claims his attorney was ineffective for allowing him to make inculpatory statements before a plea deal had been reached.... Ferguson contends that `[n]o reasonable defense attorney would have suggested such a course of action.' (Pet. at 20.) This claim is denied without an evidentiary hearing as it can be resolved by the record without the need for additional evidence.
"Contrary to Ferguson's insinuation, it was not his attorney who suggested that he make an inculpatory statement to police. Rather, it was Ferguson who initiated contact with the police and stated that he wanted to `help himself' by making a statement. It is clear from Ferguson's tape-recorded statement *438 that Attorney Glenn advised Ferguson of his right not to speak to the authorities and warned him of the possible consequences. At the beginning of the statement, Glenn reminds Ferguson about his rights and the situation:
"`[Ferguson's counsel]: Dale, you called me earlier today and you told me that you wanted to try to help yourself with the Colbert County Sheriff's Department and the FBI on these charges that are here pending today. You had information you thought that would help them. You realize that I have gone over with you your rights and told you that you don't have to talk, but it is yourbut you have informed me that you choose to help at this point to try to help yourself; is that correct?
"`Ferguson: Yes, sir.
"`[Ferguson's counsel]: Do you realize that there are no deals at this point?
"`Ferguson: Yes, sir.
"`[Ferguson's counsel]: That what you are doing is voluntary and you are doing it to try to help yourself in furtherance
"`Ferguson: Yes, sir.
"`[Ferguson's counsel]:of this; is that correct?
"`Ferguson: Yes, sir.
"`[Ferguson's counsel]: And this is what you want to do?
"`Ferguson: Yes, sir.
"`[Ferguson's counsel]: And do you realize that this is on the record, this tape that we are making here today can and will more than likely be used in court?
"`Ferguson: Yes, sir.
"`[Ferguson's counsel]: Okay. With that, do you want to go forward?
"`Ferguson: Yes, sir.'
"(CR. 98, 262-263) The taped statement clearly reveals that it was Ferguson who wished to make the statement to police and not his attorney who suggested that he do so. In Gibby v. State, 753 So.2d 1206 (Ala.Crim.App.1999), the Alabama Court of Criminal Appeals reviewed Gibby's post-conviction allegation that he was denied his right to testify at his trial. The Alabama Court of Criminal Appeals held that Gibby's allegation was without merit because the record on direct appeal indicated that `[Gibby] knowingly and voluntarily waived his constitutional right to testify at his trial.' Id. at 1208. It is equally apparent that Glenn advised Ferguson about his rights and warned him that his statement would most likely be used against him in court. Despite these warnings, Ferguson, upon his own volition, chose to make a statement to police. As the Court of Criminal Appeals found on direct appeal, Ferguson's statement to police was voluntary. Ferguson, 814 So.2d 925, at 942-943.
"Moreover, `[u]nder the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' Phillips v. State, 527 So.2d 154, 156 (Ala.1988). "`A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions.'" Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App.1990) (quoting Leverett v. State, 462 So.2d 972, 976-77 (Ala.Crim.App.1984)). See also Slaton v. State, 680 So.2d 879, 900 (Ala. Crim.App.1995), affd, 680 So.2d 909 (Ala.1996). `Invited error has been applied to death penalty cases. "An invited error is waived, unless it rises to the *439 level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).' Adams v. State, [955 So.2d 1037,] 2003 WL 22026043 (Ala.Crim.App. Aug.29, 2003). Counsel cannot be held ineffective for the informed and voluntary choices of their client. Moreover, a defendant cannot voluntarily choose a course of action and then blame trial counsel for that course of action. Ferguson may not claim in his Rule 32 petition that his own choices violated his constitutional rights."
(C.R. 456-59.) The record supports the circuit court's findings, and we adopt them as part of this opinion. We further note that Ferguson has made several assertions about his attorney's performance. However, he has not adequately supported those assertions, as required by Rules 32.3 and 32.6(b), Ala. R.Crim. P. Therefore, summary dismissal was proper as to this claim.

B.
Ferguson also contends that "[t]rial counsel's performance was also objectively deficient, for many reasons and including the unavailability of sufficient funds for a thorough defense." (Ferguson's brief at p. 23.) In a footnote, he then purports not to waive any claim presented in his petition or apparent from the record. However, he does not set forth any facts or argument in support of his bare contention. Rather, he simply moves to his next ineffective-assistance allegation. Therefore, he has not complied with the requirements set forth in Rule 28(a)(10), Ala. R.App. P., as to this allegation.
Moreover, with regard to his insufficient-funds allegation, Ferguson does not list any facts to show what additional investigation counsel would have done or what additional evidence he believes counsel could have presented but for the alleged inadequacy of funds. As the circuit court found in its order dismissing the petition, "until specific acts and omissions are identified by [Ferguson], there can be no valid [ineffective-assistance] claim." (C.R. 485.) Therefore, Ferguson did not satisfy his burden of pleading as to this allegation because he did not set forth specific facts to support his bare legal conclusions. See Rules 32.3 and 32.6(b), Ala. R.Crim. P. Accordingly, summary dismissal was proper as to this allegation.

C.
Ferguson argues that the court hearing his Rule 32 petition erred in not granting him relief on his claims that his counsel was ineffective at the penalty phase for failing to present additional mitigation witnesses.
The circuit court made the following findings on this claim:
"The instant case is similarly distinguishable from Wiggins [v. Smith, 539 U.S. 510, 534 (2003)], because trial counsel presented the vast majority of mitigation evidence that Ferguson alleges should have been presented. For instance, Ferguson alleges that trial counsel should have presented evidence of physical abuse and other difficulties during his childhood. (Pet. at 62-68.) Specifically, Ferguson alleges that numerous witnesses could have testified that his stepfather was physically and verbally abusive towards him as a child. (Pet. at 64.) A review of the record, however, reveals that trial counsel did present evidence during the penalty phase that Ferguson was physically and verbally abused by his stepfather. During Dr. Chudy's testimony, the defense offered into evidence his psychological evaluation of Ferguson. (R. 790.) The psychological evaluation contained a detailed history of Ferguson's childhood. (C.R. 327-330.) That history included *440 Ferguson's recollection that his stepfather physically abused him and would ridicule his physical appearance. (C.R. 328.) Ferguson's wife, Karen, also testified that Ferguson's struggles with his stepfather made Ferguson cry. (R. 818.)
"Other alleged instances of failures by trial counsel to present mitigating evidence are equally refuted by the record. In his petition, Ferguson recounts how at one point he had to pick up his mother from her home after she was beaten by his stepfather. Ferguson said that after he picked her up, his stepfather attempted to run him off the road. (Pet. at 64.) This incident was brought out by trial counsel during the testimony of Ferguson's wife, Karen. (R. 819.)
"Ferguson also recounts how he did not learn that his stepfather was not his biological father until he was seventeen years old. Ferguson claims that he tried to establish a relationship with his biological father but abandoned his efforts under pressure from his stepfather. (Pet. at 65-66.) Ferguson contends that had trial counsel adequately investigated, they would have uncovered this information and could have presented it to the jury. The record, however, demonstrates that this information was, in fact, presented. Karen Ferguson testified at the penalty phase before the jury, that her husband was not told until he was seventeen years old that his stepfather was not his biological father. (R. 820.) Ms. Ferguson also stated that Ferguson stopped talking to his biological father because his mother and stepfather disapproved. (R. 820.)
"Ferguson also faults counsel for failing to explain that, as a result of his own childhood, he viewed his wife's stepfather as a surrogate father. Ferguson contends that counsel should have presented evidence that he respected and admired his stepfather-in-law. (Pet. at 67.) Once again, the record demonstrates that counsel did present evidence of Ferguson's close relationship with his stepfather-in-law. Karen Ferguson testified extensively about her husband's father-son type relationship with her stepfather. (R. 815-816.)
"Ferguson also faults trial counsel for failing to uncover his history of alleged mental health problems. (Pet. at 68.) Incredibly, Ferguson contends that `trial counsel made absolutely no effort to investigate such issues for the penalty phase.' (Pet. at 70.) Ferguson's claim, however, is refuted by the trial record.
"Trial counsel for Ferguson presented the testimony of clinical psychologist, Dr. James F. Chudy. Dr. Chudy testified that he was contacted by Ferguson's counsel and asked to conduct a complete psychological evaluation of Ferguson. (R. 788.) Dr. Chudy stated that he interviewed Ferguson's family, reviewed school records, administered numerous psychological tests, and conducted a clinical interview of Ferguson. (R. 788-91.) Dr. Chudy also administered tests to determine whether Ferguson suffered from any organic brain damage. (R. 791.) Dr. Chudy testified extensively about Ferguson's slow development as a child, his borderline intelligence, and his drug and alcohol abuse. (R. 792-95.) Dr. Chudy testified that Ferguson also suffered from depression, anxiety, and a personality disorder with borderline and psycho type features. (R. 795-798.) As such, any claim by Ferguson that trial counsel failed to investigate and present evidence of his mental health records is directly refuted by the record. See Gibby v. State, 753 So.2d 1206, 1207-08 (Ala.Crim.App.1999) (holding that a postconviction claim that *441 is refuted by the record on direct appeal is without merit).
"Ferguson also alleges that counsel was ineffective for failing to investigate and present evidence of his non-violent nature, love of children, and history of depression. (Pet. at 73.) Karen Ferguson, however, testified at trial that her husband was never violent and always treated her well. (R. 811, 821.) Karen also testified that Ferguson would often cry because of his difficulties with his family. (R. 819.) Dr. Chudy testified regarding Ferguson's history of depression and his attempted suicide. (R. 795, 808.)
"Ferguson is correct that counsel did not present any evidence regarding his love of children. However, such evidence would have been of no value in this case. Ferguson was convicted of murdering an eleven-year-old boy and his father after they spent the day fishing. Ferguson's own action in murdering an eleven-year-old boy to steal a truck destroys any contention that he loves children. The facts and circumstances of this case serve to diminish any mitigating value that evidence of a love of children may have carried. Even assuming that such evidence had minimal value, it would not have affected the outcome of the trial.
"Ferguson also contends that trial counsel failed to introduce evidence of his good character. (Pet. at 75.) Specifically, Ferguson argues that trial counsel should have presented evidence of his work history and of his dedication to his family. (Pet. at 76.) This claim is directly refuted by the record. Dr. Chudy's report, which was introduced into evidence, detailed Ferguson's extensive work history. (CR. 329.) Karen Ferguson also testified that her husband always provided for her and supported her while she attended nursing school. (R. 811-12.) Karen Ferguson pleaded for her husband's life and explained that he was a good man and a good husband. (R. 821-22.)
"The record in this case demonstrates that both the trial court and the jury were presented with evidence that Ferguson suffered physical and psychological abuse as a child. Trial counsel also presented evidence of Ferguson's limited intellect and his other mental health problems. Counsel also presented evidence concerning Ferguson's history of non-violence and his good character. Even if the Court assumed that the allegations in the petition are true and that counsel could have presented additional witnesses to testify regarding Ferguson's abuse as a child, his mental health problems, his drug abuse, and his good character, the evidence would be nothing more than cumulative to that already presented. Cumulative witnesses and evidence, even if true, would not have altered the trial court's opinion that death was the appropriate sentence in this case. As the Court stated in Atkins v. Singletary, 965 F.2d 952, 958-60 (11th Cir.1992), `[t]rial counsel did enough. A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance.'
"Although Ferguson now asserts that more should have been done, he cannot show that what was done was unreasonable. Perhaps the best reason for summarily denying the sort of claim presented in Ferguson's petition, is found in Chandler v. United States, 218 F.3d 1305, 1316-1317 n. 20 (11th Cir.2000).
"`For example, "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating [] *442 evidence, had they been called or ... had they been asked the right questions." Waters [v. Thomas], 46 F.3d [1506] at 1514 [(11th Cir.1995)] (en banc). But `[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.' Id. (noting that such witnesses show nothing more than that, `with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings'). And, basing the inquiry on whether an investigation (if one had been undertaken) would have uncovered mitigating evidence (or witnesses) is an example of judging counsel's acts from the benefit of hindsight. The proper inquiry was articulated in Rogers v. Zant[, 13 F.3d 384 (11th Cir.1994)]: `Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced.' (Citation omitted.)
"The record in this case supports a finding that trial counsel did enough. Counsel presented the vast majority of mitigating evidence that Ferguson alleges he did not present. Trial counsel cannot be deemed ineffective for simply failing to present cumulative mitigation testimony. See Pierce v. State, 851 So.2d 558, 582 (Ala.Crim.App.1999), rev'd on other grounds, 851 So.2d 618 (Ala.2002) (`"Trial counsel's performance was not `outside the wide range of professionally competent assistance' simply because they failed to present evidence that would have been cumulative of other evidence presented at trial."'). Moreover, `counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence.' Williams v. State, 783 So.2d 108, 117 (Ala.Crim.App.2000). "`There ha[s] never been a case where additional witnesses could not have been called.'" Fortenberry v. State, 659 So.2d 194, 199 (Ala.Crim.App.1994), quoting State v. Tarver, 629 So.2d 14, 21 (Ala.Crim.App.1993). `The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.' Chandler, 218 F.3d at 1317 (11th Cir.2000) (quoting Waters v. Thomas, 46 F.3d 1506 (11th Cir.1995)).
"Finally, in light of the nature and circumstances of this crimethe robbery and murder of a father and his young sonand the specific findings made by the sentencing authority, there is no reasonable probability that the mitigating circumstances alleged in the petition, even if true, would have altered the balance of aggravating and mitigating factors in this case. See Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir.2001). The sentencing authority was well aware of the mitigation evidence presented at trial.
"The sentencing authority determined that Ferguson's difficult childhood was not a mitigating factor. (C.R. 140.) This Court agrees. Ferguson was 24 years old at the time of the crime. He had been married for five years and was able to support himself and his wife while she attended nursing school. Under the circumstances of this case, the petition's allegations of childhood abuse and borderline intellect, even if true, would not mitigate his actions as an adult.
"Additionally, Ferguson's mental health problems were thoroughly investigated *443 and presented by trial counsel. The sentencing authority determined that Ferguson's mental health problems did not diminish his ability to distinguish right from wrong or to control his actions. (CR. 138.) This Court agrees. Ferguson's mental health problems were not of such a severe degree that Ferguson was less culpable for his actions.
"Additionally, evidence of Ferguson's non-violent nature and his good character were introduced through his wife, Karen Ferguson. This mitigating evidence, along with the other mitigating evidence presented at trial and that alleged in the petition is outweighed by the aggravating circumstance in this case.
"Finally, the jury recommended by an 11 to 1 vote that Ferguson be sentenced to life without the possibility of parole. Clearly, trial counsel was effective in convincing the jury to reject the death penalty. See, e.g., White v. State, 587 So.2d 1218, 1235 (Ala.Crim.App.1990) (`A strong indication of trial counsel's proficiency is the fact that the jury, despite the defendant's two damning and incontrovertible confessions, recommended a sentence of life without parole. We find no merit to the defendant's contention that he was denied the effective assistance of counsel.'). As such, Ferguson has failed to state a claim that would entitle him to relief. This claim is therefore summarily dismissed. Ala. R.Crim. P. 32.7(d)."
(C.R. 487-93) (footnotes omitted). The circuit court's findings are supported by the record, and we adopt them as part of this opinion.

IV.
Additionally, Ferguson argues that the circuit court erred in adopting the State's order summarily dismissing his petition.
"`While the practice of adopting the State's proposed findings of fact and conclusions of law is subject to criticism, the general rule is that even when the court adopts proposed findings and conclusions verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Ala.Cr. App.1989), cert. denied, 498 U.S. 882, 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala. Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990).'
"Wright v. State, 593 So.2d 111, 117-18 (Ala.Cr.App.1991), cert. denied, [506] U.S. [844], 113 S.Ct. 132, 121 L.Ed.2d 86 (1992)."
Holladay v. State, 629 So.2d 673, 687-88 (Ala.Crim.App.1992). The circuit court's findings in this regard are not clearly erroneous and are more than supported by the record.

V.
Finally, Ferguson argues that the circuit court erred in summarily dismissing his remaining claims. He cites several different grounds in support of this assertion.

A.
First, Ferguson contends that the circuit court improperly summarily dismissed his claim that he was not competent to stand trial. In its order dismissing the petition, the circuit court found:
"On pages 86-92 of his petition, Ferguson alleges that the trial court erred when it found him competent to stand trial. This claim is procedurally barred *444 under Ala. R.Crim. P. 32.2(a)(2) from review because Ferguson's competency was resolved at trial. (C.R. 40-49.) Additionally, this claim is procedurally barred under Ala. R.Crim. P. 32.2(a)(5) because it could have been but was not raised on appeal. Rule 32.2(a)(5) of Ala. R.Crim. P. and Alabama caselaw both provide that relief cannot be given on a claim that could have been raised or addressed on appeal but was not.
"Moreover, any claim of incompetence was refuted by Ferguson's own expert psychologist at trial. During the penalty phase of his trial, Ferguson presented the testimony Dr. James Chudy, a clinical psychologist. In Dr. Chudy's report, which was admitted into evidence, he found the following:
"`[Ferguson] was able to follow the line of questioning coherently and he provided answers that were logical and goal-directed. It was apparent from the questioning that he was coherent when it came to understanding the legal proceedings and the charges against him. He understood the judicial process and he understood what would happen if found guilty.'
"(CR. 330.) In addition, Stephen Rosen, a forensic psychologist, was appointed by the court to perform a competency evaluation. (R. 836.) Dr. Rosen, like Dr. Chudy, also determined that Ferguson was competent to stand trial. (CR. 46-47.) Accordingly, this claim is directly refuted by the record and is summarily dismissed pursuant to Ala. R.Crim. P. 32.7(d)."
(C.R. 495-96.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Therefore, summary dismissal was proper as to this claim.

B.
Second, Ferguson contends that the circuit court improperly summarily dismissed his juror-misconduct claim. In its order dismissing the petition, the circuit court found:
"On pages 95-97 of his Rule 32 petition, Ferguson claims that several instances of jury misconduct occurred. This claim is procedurally barred from review because it could have been but was not raised at trial or on appeal. Ala. R.Crim. P. 32.2(a)(3) and (5). Nowhere in his petition does Ferguson provide any reason why this claim could not have been raised either at trial or on appeal. As such, this claim is summarily dismissed. Ala. R.Crim. P. 32.7(d)."
(C.R. 496.) The record supports the circuit court's findings, and we adopt them as part of this opinion. Therefore, summary dismissal was proper as to this claim.

C.
Third, Ferguson contends that the circuit court improperly summarily dismissed his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), claim. In its order dismissing relief on this claim, the circuit court found:
"On pages 103 and 104 of his petition, Ferguson contends that the State of Alabama violated Brady v. Maryland, 373 U.S. 83 (1963), by not disclosing the statements of his codefendants and `some of the physical evidence.' Both of these claims are summarily dismissed because they are procedurally barred from review. Ala. R.Crim. P. 32.2(a)(3) and (5).
"Moreover, the claims as pleaded, are insufficiently specific. For example, to satisfy his burden under Ala. R.Crim. P. 32.3 and 32.6(b), Ferguson is required to identify what was contained in the co-defendant's statements and why the statements were material within the definition of Brady. Furthermore, Ferguson *445 failed to identify the physical evidence in this case that was not turned over. Ferguson's claim fails to comply with the specificity and full factual pleading requirements of Ala. R.Crim. P. 32.6(b). As such, it is summarily dismissed by the Court. Ala. R.Crim. P. 32.7(d)."
(C.R. 497-98.) The record supports the circuit court's findings, and we adopt them as part of this opinion.

D.
Finally, Ferguson contends that the circuit court improperly summarily dismissed many of his remaining claims. Although he makes fleeting references to many of the remaining claims he raised in his petition, he does not set forth any facts or argument as to why summary dismissal was improper, as is required by Rule 28(a)(10), Ala. R.App. P. Moreover, the circuit court set forth sufficient reasons for its summary dismissal of his claims in its order. Therefore, Ferguson's argument is without merit.
For these reasons, we hold that the court hearing Ferguson's Rule 32 petition did not abuse its discretion in summarily dismissing Ferguson's postconviction petition.
AFFIRMED.
McMILLAN, WISE, and WELCH, JJ., concur.
SHAW, J., concurs in the result.
BASCHAB, P.J., concurs in part and dissents in part, with opinion.
BASCHAB, Presiding Judge, concurring in part and dissenting in part.
I concur as to the parts of the majority opinion that address issues other than the penalty phase of the appellant's trial and the propriety of his sentence. However, for the reasons set forth herein, I must respectfully dissent as to the majority's conclusion regarding the propriety of the appellant's sentence.
With regard to sentencing in capital cases, § 13A-5-47(e), Ala.Code 1975, provides:
"In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
(Emphasis added.) The emphasized language, which allows a trial court to override a jury's sentence recommendation in a capital case, has been the subject of much criticism and debate, as well as several Alabama Supreme Court decisions, in recent years.
In Ex parte Taylor, 808 So.2d 1215 (Ala. 2001), by a vote of 7-5, the jury recommended that Taylor be sentenced to imprisonment for life without the possibility of parole, but the trial court overrode the jury's recommendation and sentenced him to death. Taylor challenged the override, arguing that "there is no standard to guide the trial judge in determining whether to accept or to reject the jury's recommended sentence." Ex parte Taylor, 808 So.2d at 1218 (footnote omitted). The Alabama Supreme Court examined the provisions for a jury override in Alabama and concluded:
"This Court held in Ex parte Jones, 456 So.2d 380 (Ala.1984), that the Constitution of the United States does not require the `[adoption of] specific limitations on the trial court's power to override *446 the jury's advisory verdict' and that Alabama's capital-sentencing procedure provides sufficient protection for capital defendants because `[t]he whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation' of life imprisonment. 456 So.2d at 382. Under Alabama's capital-sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties. § 13A-5-47(d), Ala.Code 1975. In making these findings, the trial judge must consider a jury's recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala.Code 1975 (`in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict'). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it. McCausland v. Tide-Mayflower Moving & Storage, 499 So.2d 1378, 1382 (Ala.1986) (stating that subsections of a statute `should be construed together to ascertain the meaning and intent of each'). Therefore, we hold that Alabama's capital-sentencing procedure does not result in the imposition of the death sentence in an arbitrary and capricious manner in violation of the Fourteenth Amendment.
"In this case, the trial judge stated that `[t]he sentence recommendation of a properly functioning jury is entitled to great respect.' He reasoned, however, that `[w]hile the jurors in this case were cooperative, harmonious, diligent, and attentive, some jurors' outbursts of emotion after they found the defendant guilty of capital murder indicated that they were overwhelmed by their impending duty to consider the death penalty as required by law.' The trial judge then concluded that the crimes proved against Taylor were `abominably aggravated and, at best, only faintly mitigated.' Thus, the trial judge considered the jury's recommendation, as required by Alabama's death-penalty statute, but permissibly assessed it very little weight, given the particular circumstances of this case. Therefore, we agree with the conclusion of the Court of Criminal Appeals that `the trial court complied with the sentencing scheme of Alabama's death-penalty statute and that the sentence it imposed, overriding the jury's recommendation, met constitutional requirements and was not arbitrary, discriminatory, or fundamentally unfair.' Taylor v. State, 808 So.2d [1148] at 1190 [(Ala.Crim.App.2000)]."
Ex parte Taylor, 808 So.2d at 1219 (footnote omitted; emphasis added).
In Ex parte Carroll, 852 So.2d 833 (Ala. 2002), by a vote of 10-2, the jury recommended a sentence of imprisonment for life without the possibility of parole, but the trial court overrode that recommendation and sentenced Carroll to death. Ultimately, the Alabama Supreme Court reversed the trial court's decision to override the jury's recommendation, explaining as follows:
"In its revised sentencing order on the second remand, the trial court explained its override of the jury's recommendation of a sentence of life imprisonment without the possibility of parole as follows:
"`"The jury did not have before [it] the presentence report, background information and history of the defendant, his family, education and work history. The jury was not aware of *447 the fact that the defendant had served a period of incarceration and had just been released for a very short time when he obtained a weapon and committed this intentional murder during a robbery. The jury did not view and was not privy to the expression of the pain of the victim's family expressed at the sentencing hearing before the Court.
"`"Although this Court always gives, and did in this case give, great weight and consideration to a jury's recommendation as to punishment, considering the above, the Court found it appropriate to overrule the jury's recommendation of life without parole."'
"Carroll [v. State,] 852 So.2d [830,] 832 [(Ala.Crim.App.2001)] (quoting the trial court's order). We find two aspects of the trial court's order troubling.
"First, it is clear from the foregoing excerpt from the trial court's order that the trial court considered Carroll's incarceration for youthful-offender adjudications in negating the mitigating circumstance of no significant criminal history. We specifically stated in Ex parte Burgess, 811 So.2d 617 (Ala.2000), that a trial court is not allowed to do so. ... Because Carroll's incarceration shortly before the murder in this case was the result of youthful-offender adjudications, the trial court's second order on remand, justifying its use of Carroll's juvenile record as the basis for giving little or no weight to the mitigating circumstance that Carroll had no significant history of prior criminal activity, conflicts with our observation in [Ex parte] Carroll [, 852 So.2d 821 (Ala.2001) ] (`Carroll III') and with our direction in Ex parte Burgess.

"Second, in light of the wish of the victim's family that Carroll be sentenced to life imprisonment without parole rather than sentenced to death, evidence that was admitted without objection, we find it hard to reconcile the trial court's reliance upon the `pain of the victim's family' as one of its reasons for overriding the jury's recommendation.
"Although the trial court stated that it `always gives, and did in this case give, great weight and consideration to a jury's recommendation as to punishment,' under the circumstances here presented, where other aspects of the trial court's order on remand are problematic, it appears that it gave insufficient weight to the jury's recommendation that Carroll be sentenced to life imprisonment without parole. In this case, the recommendation was entitled to considerable weight.

"We take this opportunity to further explain the effect of a jury's recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the `triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.

"Based on an appellate court's duty to independently weigh the aggravating and mitigating circumstances in a capital case, and treating the jury's recommendation *448 as a mitigating circumstance in this case, we conclude that the trial court's override in this case of the jury's recommended sentence of life imprisonment without parole and that court's subsequent sentence of death were improper under the circumstances presented here. See § 13A-5-53(a) and (b), Ala.Code 1975. Here we have overwhelming support of a sentence of life imprisonment without the possibility of parole, as evidenced by the jury's vote of 10-2 for such a sentence. Furthermore, Justice Houston in a special writing in Carroll III ably marshaled all of the factors that make the sentence of death in this case excessive and disproportionate.
"`Given the jury's recommendation of life imprisonment without parole; the recommendation of the victim's family that the defendant be sentenced to life imprisonment without parole; the fact that the defendant was 17 years old when he committed the crime; and the circumstances of the crime (particularly that the defendant made no attempt to kill the witnesses to the crime), ... the sentence of death is excessive and disproportionate.'
"852 So.2d at 828 (Houston, J., concurring in part and dissenting in part). Because of Carroll's age at the time of the offense, his lack of a significant criminal history, and the recommendation of the victim's family that he be sentenced to life imprisonment without parole, the jury's 10-2 recommendation that he not be sentenced to death tips the scales in favor of following the jury's recommendation. We therefore reverse the judgment of the Court of Criminal Appeals as to Carroll's sentence and remand the case for that court to instruct the trial court to resentence Carroll following the jury's recommendation of life imprisonment without the possibility of parole."
Ex parte Carroll, 852 So.2d at 835-37 (footnote omitted).
Finally, in Ex parte Tomlin, 909 So.2d 283, 284-85 (Ala.2003),
"Phillip Wayne Tomlin was convicted, for the fourth time, of the intentional murders of Brune and Moore, an offense made capital because two people were intentionally killed pursuant to one act or a series of acts. See § 13-11-2(a)(10), Ala.Code 1975 (repealed).
"The jury at Tomlin's fourth trial was not asked to make a sentencing recommendation. Instead, the parties stipulated that the jury at Tomlin's third trial, by a vote of 12-0, had recommended that Tomlin be sentenced to life imprisonment without the possibility of parole. After a sentencing hearing, the trial court overrode the jury's recommendation and sentenced Tomlin to death."
The Alabama Supreme Court reversed this court's judgment, in which we affirmed the trial court's decision to override the jury's recommendation, explaining:
"The trial court then explained its weighing of the aggravating circumstances and the mitigating circumstances and proceeded to override the jury's recommendation, stating:
"`The Court has carefully, and at length, reviewed the aggravating circumstances and the statutory and non-statutory mitigating circumstances and has given serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole and the evidence received by the jury at the hearing.
"`The other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first degree murder of the same two people *449 and [was] sentenced to death. This Court is charged with the duty to insure that the death penalty is not imposed in a freakish, arbitrary, wanton or capricious manner. That is the reason this Court has the authority to reject a jury's recommendation of death and impose life [imprisonment] without parole and conversely the authority to reject a jury's recommendation of life without parole and impose death, if by doing either the Court prevents such prohibited imposition.
"`In light of the peculiar circumstances in this case with regard to this defendant, this Court is of the opinion that the acceptance of the jury's recommendation would be wrong.
"`For our judicial system to say, under the circumstances of this case, that the hit man should be sentenced to death but that the hirer, the planner, the cold avenger and the co-executioner should be sentenced to life [imprisonment] without parole is an aberration; a freak that cannot be allowed.
"`In view of the foregoing, this Court, even though the Court finds and considers only one aggravating circumstance under its interpretations of Ex parte Hays, 518 So.2d 768 (Ala. 1986), cert. denied, Hays v. Alabama, [485 U.S. 929,] 108 S.Ct. 1099, overrides the jury recommendation and sentences [Tomlin] to death.'
"We conclude that, under the circumstances presented here, the trial court's override of the jury's recommended sentence of life imprisonment without parole and that court's subsequent sentence of death were improper.
"`[T]he death penalty should be carried out only after this Court has found it appropriate to do so by independently weighing the aggravating and mitigating circumstances.' Ex parte Hays, 518 So.2d 768, 780 (Ala.1986)(opinion on rehearing). Therefore, while the trial court, acting without the guidance offered by Carroll, gave `serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,' we are compelled to treat the jury's recommendation as a mitigating circumstance. Indeed, we must give that mitigating circumstance great weight.

"`The weight to be given [a jury's recommendation of life imprisonment without the possibility of parole] should depend upon the number of jurors recommending a sentence of life imprisonment without parole.' Carroll, 852 So.2d at 836. In Carroll, we found that a jury's 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated `overwhelming support' of such a sentence. 852 So.2d at 837. Therefore, it is only logical to conclude that a unanimous recommendation like the one here provides even more `overwhelming support' of such a sentence and, therefore, must be afforded great weight.

"`The weight to be given [a jury's recommendation of life imprisonment without the possibility of parole] should depend ... also upon the strength of the factual basis for such a recommendation in the form of information known to the jury.' Carroll, 852 So.2d at 836. Here, the State does not question `the strength of the factual basis for [the jury's] recommendation.' Indeed, the State argues only that `the [trial] court considered factual information known to the jury in finding the existence of one aggravating factorfirst degree murder wherein two persons were killed.' State's brief, at 34-35. Thus, we must *450 conclude that the jury's recommendation rested upon an adequate factual basis.
"`[T]he jury's recommendation [of life imprisonment without the possibility of parole] may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.' Carroll, 852 So.2d at 836. Here, the trial court overrode the jury's recommendation, because `[t]he other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first degree murder of the same two people and [was] sentenced to death.' Although the jury was not aware of Daniels's sentence, his sentence cannot properly be used to undermine a mitigating circumstance.
"As noted in the State's brief, `Tomlin... argues ... that the trial court erred in considering his co-defendant's sentence because it is not an aspect of Tomlin's character or of the crime.' State's brief, at 37. The State admits that `Tomlin's reasoning is correct to the extent that he argues that his co-defendant's sentence should not be treated as a mitigating or aggravating circumstance. It is not an aspect of [Tomlin's] character or of the crime.' State's brief, at 37-38. It would be inconsistent with the State's admission for this Court to hold that Daniels's sentence could properly be used to undermine the jury's recommendation of life imprisonment without the possibility of parole. See Coulter v. State, 438 So.2d 336, 345 (Ala. Crim.App.1982), aff'd, 438 So.2d 352 (Ala.1983) (`In the sentencing phase of the trial, the fact that an alleged accomplice did not receive the death penalty is no more relevant as a mitigating factor for the defendant than the fact that an alleged accomplice did receive the death penalty would be as an aggravating circumstance against him.') (emphasis added).
"For the foregoing reasons, we reverse the judgment of the Court of Criminal Appeals as to Tomlin's sentence and remand the case for that court to instruct the trial court to resentence Tomlin, following the jury's recommendation of life imprisonment without the possibility of parole."
Ex parte Tomlin, 909 So.2d at 286-87 (footnote omitted; emphasis added).
Although neither this court nor the Alabama Supreme Court has had occasion to determine whether the decisions in Ex parte Carroll and Ex parte Tomlin apply retroactively to cases on collateral review, we find the following comments by the Alabama Supreme Court to be instructive[5]:
"Recently, the Supreme Court has held that new rules will not be announced or applied, with limited exceptions, in federal habeas corpus cases brought by state prisoners after their convictions have become final. See, e.g., Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, *451 111 L.Ed.2d 30 (1990); Butler v. McKellar, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The Court has contemporaneously held, however, that
"`When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions. See Great Northern R. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 364, 53 S.Ct. 145, 77 L.Ed. 360 (1932) ("We think the federal constitution has no voice upon the subject [of whether a state court may decline to give its decisions retroactive effect]").'
"American Trucking Associations, Inc. v. Smith, 496 U.S. 167, 110 S.Ct. 2323, 2330, 110 L.Ed.2d 148 (1990) (brackets in original).
"A useful test for retroactive application in criminal cases was articulated by the Supreme Court as follows:
"`In deciding whether to apply newly adopted constitutional rulings retroactively, we have considered three criteria: (1) the purpose of the new rule; (2) the extent of reliance upon the old rule; and (3) the effect retroactive application would have upon the administration of justice.'
"Halliday v. United States, 394 U.S. 831, 832, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969); Allen v. Hardy, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986)."
Ex parte Coker, 575 So.2d 43, 52 (Ala. 1990).
"Although circumstances occasionally dictate that judicial decisions should be applied prospectively, James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 536, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), retroactive application of judgments is `overwhelmingly the normal' practice. Id. at 535. Retroactivity `is in keeping with the traditional function of the courts to decide cases before them based upon their best current understanding of the law.... It also reflects the declaratory theory of law, ... according to which the courts are understood only to find the law, not to make it'. Id. at 535-36. The United States Supreme Court has suggested consideration of the following factors in choosing whether to apply a judicial decision prospectively:
"`First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp., [392 U.S. 481, 496, 88 S.Ct. 2224, 2233, 20 L.Ed.2d 1231 (1968)] ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, e.g., Allen v. State Board of Elections, [393 U.S. 544, 572, 89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969)]. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." Linkletter v. Walker, [381 U.S. 618, 629, 85 S.Ct. 1731, 1737-38, 14 L.Ed.2d 601 (1965)]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the `injustice or hardship' by a holding of nonretroactivity."'
"Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 *452 (1971)[, but see Harper v. Virginia Dep't of Taxation, 509 U.S. 86 (1993)]."
McCullar v. Universal Underwriters Life Ins. Co., 687 So.2d 156, 165 (Ala.1996).
First, based on the language in Ex parte Taylor, it appears that the purpose of Ex parte Carroll and Ex parte Tomlin is to assure that death sentences are not imposed in an arbitrary and capricious manner. Retroactive application of these decisions would surely further that purpose. Second, the decisions in Ex parte Carroll and Ex parte Tomlin do not set forth entirely new principles of law. Rather, they provide clarification or guidance with regard to the requirements set forth in § 13A-5-47(e), Ala.Code 1975. Finally, retroactive application would not produce inequities in sentencing. Rather, if anything, it should serve to correct inequities in sentencing. Therefore, the Alabama Supreme Court's decisions in Ex parte Carroll and Ex parte Tomlin should apply retroactively, even to cases on collateral review.
Turning to the specific facts of this case, I first note that the judge who presided over the Rule 32 proceedings is not the judge who sentenced the appellant. Thus, it appears that the sentencing judge is no longer on the bench.
I further note that, in its sentencing order, the trial court found only one statutory aggravating circumstancethe appellant committed the murders while he was engaged in the commission of a robbery. See § 13A-5-49(4), Ala.Code 1975. It also found the existence of only one statutory mitigating circumstancethe appellant did not have a significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. The trial court found the following to be nonstatutory mitigating circumstances(1) the appellant surrendered to the authorities and confessed to his involvement in the murders, although he waited until one month after the murders to do so; and (2) the jury recommended a sentence of imprisonment for life without the possibility of parole. With regard to his consideration of the jury's sentence recommendation, the trial judge specifically stated:
"The Court does find that the jury's recommendation of life imprisonment without parole is a mitigating factor and the Court has considered said mitigating factor at the sentence hearing. However, the Jury was allowed to hear an emotional appeal from the defendant's wife. The Court further finds that the defendant's problems during his childhood is not a mitigating factor.
"There was also evidence presented to the jury that Mark Moore was the instigator of the killings of Harold and Joey Pugh, but that fact alone does not make the defendant any less culpable and is not a mitigating factor. The defendant was able and capable to make choices.
"The Court has also considered the Pre-Sentence Investigation Report as set out in Section 13A-5-47, Code of Alabama, as amended, in determining a sentence in this case.
"The Court having considered the aggravating circumstances and the mitigating circumstances, finds that the aggravating circumstances due to the nature of the crime and the defendant's involvement in it outweighs the mitigating circumstances presented, and the mitigating factor that the jury recommended a sentence of life imprisonment without parole and the vote was 11 for life and 1 for death.
"The Court does find that there is a reasonable basis for enhancing the jury's recommendation of life imprisonment without parole for the reasons stated herein, and this was a murder of [an] adult man and his young son during a *453 robbery, and the defendant had the opportunity to reflect and withdraw from his actions and chose not [to] do so; that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired."
(A.C.R. 140.)
The trial judge entered his sentencing order before the Alabama Supreme Court released its decisions in Ex parte Taylor, Ex parte Carroll, and Ex parte Tomlin. Nevertheless, he did state specific reasons for giving the jury's recommendation the consideration he gave it, as required by Ex parte Taylor, and did treat the jury's recommendation as a mitigating circumstance, as required by Ex parte Carroll. The trial judge did not specifically state what weight he gave the jury's recommendation. However, it does not appear to have been considerable, as was required with regard to a 10-2 recommendation in Ex parte Carroll, or great, as was required with regard to a 12-0 recommendation in Ex parte Tomlin. Because the jury recommended a sentence of imprisonment for life without the possibility of parole by a margin of 11-1, it is reasonable to conclude that it was entitled, at a minimum, to considerable weight. Moreover, as the trial judge recognized in his sentencing order, there was information before the jury that established that the jury's recommendation rested upon an adequate factual basis. Specifically, the trial judge made reference to an emotional appeal by the appellant's wife and to evidence regarding problems during the appellant's childhood. Finally, the trial judge did not cite to any information that was not known to the jury when it overrode the jury's recommendation.
Under these specific circumstances, giving considerable weight to the jury's sentence recommendation when weighing the above-referenced mitigating circumstances against the one aggravating circumstance, I would conclude that the trial court erred in overriding the jury's recommended sentence of imprisonment for life without the possibility of parole. Therefore, this court should remand this case to the circuit court for that court to resentence the appellant, following the jury's recommendation, to imprisonment for life without the possibility of parole. *454
NOTES
[1] We treat a motion or filing according to its substance and not its style. See Ex parte Deramus, 882 So.2d 875 (Ala.2002).
[2] Section 13A-5-47(e), Ala.Code 1975, states:

"In deciding upon the sentence, the trial court shall determine whether the aggravating circumstance it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury's recommendation concerning sentence shall be given consideration, it is not binding upon the court."
(Emphasis added.) This statute is commonly referred to as Alabama's Judicial Override statute.
[3] In Danforth v. Minnesota, 552 U.S. ___, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), the United States Supreme Court held that under the Teague analysis a state supreme court may give broader application to a new rule than is given by the United States Supreme Court. The United States Supreme Court in American Trucking Associations, Inc. v. Smith, 496 U.S. 167, 177, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990), also stated: "When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions."
[4] The United States Supreme Court in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), held that executing a mentally retarded individual was not "categorically prohibited" by the Eighth Amendment. This decision was overruled by Atkins v. Virginia.
[5] In arguing that Ex parte Carroll and Ex parte Tomlin should be applied retroactively on collateral review, the appellant relies on Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Also, the majority cites to Teague when questioning whether these decisions apply retroactively. However, Alabama appellate courts have relied on Teague primarily when deciding whether to apply United States Supreme Court decisions retroactively rather than when deciding whether to apply Alabama appellate court decisions retroactively. See, e.g., Duncan v. State, 925 So.2d 245 (Ala.Crim.App.2005); Clemons v. State, [Ms. CR-01-1355, August 29, 2003] ___ So.3d ___ (Ala.Crim.App.2003), rev'd on other grounds, [Ms. 1041915, May 4, 2007] ___ So.3d ___ (Ala.2007); Sanders v. State, 815 So.2d 590 (Ala.Crim.App.2001).